UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 12-cr-20276-MORENO/O'SULLIVAN

UNITED STATES OF AMERICA,
      Plaintiff,

v.

HENRY LEE BRYANT,
DANIEL MACK and
OCTAVIUS MCLENDON
      Defendants.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Defendant Henry Lee Bryant's Rule 33 Motion for New Trial Based on Newly Discovered Evidence with Incorporated Memorandum of Law, and Motions for Full Discovery, for an Evidentiary Hearing, and to Adopt the Corresponding Motions Filed or to Be Filed by and on Behalf of Codefendants Mack & McLendon (DE# 181, 10/8/15) (hereinafter "Bryant's Motion for New Trial"), Defendant Daniel Mack's Motion for New Trial Pursuant to Fed. R. Crim. P. Rule 33 and Brady v. Maryland, 373 U.S. 83 (1963), and Request for Hearing (DE# 182, 10/8/15) (hereinafter "Mack's Motion for New Trial") and Defendant McLendon's Motion for New Trial and an Evidentiary Hearing and Supporting Memorandum of Law (DE# 187, 10/13/15) (hereinafter "McLendon's Motion for New Trial").[1]

Having reviewed the parties' filings and having conducted an evidentiary hearing on May 31, 2016 and June 2, 2016, the undersigned RESPECTFULLY RECOMMENDS that Bryant's Motion for New Trial (DE# 181, 10/8/15) and McLendon's Motion for New Trial (DE# 187, 10/13/15) be **DENIED** and that Mack's Motion for New Trial be **GRANTED** for the reasons set forth below.

_____

[1] The defendants adopt the arguments raised in each other's filings.

## BACKGROUND

**A.    The Defendants' Convictions**

Henry Lee Bryant, Daniel Mack and Octavius McLendon were charged with conspiracy to possess with intent to distribute cocaine in violation of Title 21, United States Code, Section 846 (Count 1); two counts of attempting to possess with intent to distribute cocaine in violation of Title 21, United States Code, Section 846 (Counts 2 and 3) and possession of a firearm during and in relation to a drug trafficking crime in violation of Title 21, United States Code, Section 924(a)(1)(A) and 2 (Count 4). See Superseding Indictment (DE# 38, 6/29/12). The trial in this case began on October 2, 2012 and continued through October 10, 2012. During the trial, the government presented the testimony of FBI Special Agent Dante Jackson (hereinafter "Agent Jackson") and Baltimore Police Detective KayTee Tyson, among other witnesses.

On October 10, 2012, the jury returned guilty verdicts against Mr. Bryant and Mr. McLendon on all charges. See Judgments in a Criminal Case (DE# 121, 123, 12/21/12). Mr. Mack was convicted of all charges except one count of attempting to possess with intent to distribute cocaine. See Judgment in a Criminal Case (DE# 122, 12/21/12).[2]

**B.    The Appeal**

The defendants appealed their convictions. Mr. Bryant also appealed his sentence. On July 24, 2014, the Eleventh Circuit affirmed the defendants' convictions

---

[2] "Mack was specifically convicted of carrying a firearm during and in relation to the drug trafficking crime, McLendon and Bryant were convicted of possessing a firearm in furtherance of the crime (on an aiding-and-abetting theory)." United States v. Mack, 572 F. App'x 910, 924 n.14 (11th Cir. 2014).

and Mr. Bryant's sentence. See United States v. Mack, 572 F. App'x 910 (11th Cir. 2014). The Eleventh Circuit found that there was sufficient evidence to support the defendants' convictions for the drug charges and the firearm charges.[3]

In addressing the drug charges, the Eleventh Circuit considered "the sufficiency of the evidence that Defendants knew that the transaction involved drugs." Id. at 917. With respect to Mr. Bryant, the Eleventh Circuit stated that:

> **The record is rife with evidence of Bryant's knowledge that the contents of the cargo consisted of drugs**. On December 9, 2011, Agent Jackson told Bryant "it's **ten keys** . . ., I mean that's what gonna be moving." Bryant responded, "okay." Jackson repeated himself, to be clear that Bryant understood, "[j]ust so you know. Uh, its **ten kilo's**." Bryant again said, "okay." Bryant acknowledged that moving the drugs was "a huge risk" and that the police he had recruited to do the job "usually get paid four, five gran' a piece."
>
> Later in the conversation, Agent Jackson stated, "it's not a incre-, incredible amount of **cocaine**, I mean so it ain't a ton. Know what I mean?" Bryant replied, "I understand, I understand." Jackson also said that "**cocaine prices isn't what it used to be** . . . ." Bryant hung up when Jackson, on one occasion, referred to the **"coke"** during a telephone conversation with him, and later chided Jackson for using that term on the telephone. Bryant suggested that Agent Jackson could use many other terms to refer to cocaine. **There can be no doubt that Bryant knew exactly what he had agreed to transport**. Thus, his conviction on the drug charges must be upheld.

Id. at 917-18 (emphasis added; footnote omitted).[4]

As to Mr. McLendon, the Eleventh Circuit stated that:

> **The evidence is ample with respect to McLendon's knowledge that**

_____

[3] The Eleventh Circuit reviewed the evidence in the light most favorable to the government. Mack, 572 F. App'x at 917.

[4] The Eleventh Circuit's opinion states that Mr. Bryant hung up the phone when Agent Jackson used the word "coke." However, the transcript of the December 10, 2011 conversation shows that Agent Jackson used the word "dope." See Government's Exhibit 53, Tab D at 2.

**the offense involved drugs**. Bryant stated to Agent Jackson that McLendon would serve as his "point man" to the police officers on the transaction and that he and McLendon have been "in this thing" since they were children.

In addition, McLendon's knowledge of the drugs is supported by independent evidence. McLendon was present at the nightclub office on December 21, 2011 when Det. Tyson marked each of the nine brick-shaped items, counted them, and placed them in a duffel bag. Det. Tyson then handed the bag to McLendon and told him that "there's nine in there" and that "[they] need[ed] to make sure all nine of these get there."

McLendon contends that he was not told what was contained in the "opaque, brick-shaped, shrink-wrapped items that were placed in a duffel bag by the undercover agents and given to him and Bryant to transport." But **Det. Tyson instructed both Bryant and McLendon that there can be "no deviation, no test, no taste" and asked "neither one of y'all get high right?"**

McLendon points out that Det. Tyson himself told McLendon and Bryant that they were transporting money, not drugs, by making the statement "cause this money, see what I'm saying?" However, that statement was made immediately after Tyson had counted the nine brick-like objects and after he had handed the bag to McLendon, cautioning him that they needed to make sure the cargo reaches its destination intact. Thus, this statement is consistent with Tyson's testimony that he sought to communicate to McLendon and Bryant that the nine kilograms of cocaine were worth a lot of money to him. In sum, **the evidence in the record fully sustains McLendon's conviction on the drug charges**.

Mack, 572 F. App'x at 918-19 (emphasis added).

Finally, with respect to Mr. Mack, the Eleventh Circuit acknowledged that "the evidence of Mack's knowledge of the drugs [wa]s not overwhelming." Mack, 572 F. App'x at 919. Nonetheless, the Eleventh Circuit determined that there was sufficient evidence to support Mr. Mack's conviction on the drug charges. Id. Specifically, the Eleventh Circuit noted that Mr. Mack arrived at a meeting on January 14, 2012 wearing his full police uniform, but no name tag, and had a visible weapon in its holster. Id. Approximately two hours later, FBI agents observed Mr. Mack's marked police vehicle

4

closely following the vehicle Mr. Bryant and Mr. McLendon were using to transport the sham cocaine. Id. The Eleventh Circuit noted that it "ha[s] held that [a defendant's] 'repeated presence at the scene of the drug trafficking . . . can give rise to a permissible inference of participation in the conspiracy'" and that "[a]lthough 'mere presence,' standing alone, is insufficient to support a conviction for a drug-related offense, it is 'a material and probative factor' that may be considered by the jury in reaching the verdict." Id. (citing United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997) and United States v. Baptista-Rodriguez, 17 F.3d 1354, 1374 (11th Cir. 1994)). The Eleventh Circuit stated that "Mack's presence extend[ed] not only to his participation in the January 14, 2012 meeting, but to his subsequent escort of the drugs later that day." Mack, 572 F. App'x at 919. The Eleventh Circuit further stated that "the record reflect[ed] additional proved circumstances that support the inference of Mack's guilty knowledge" and cited a conversation between Mr. Mack and Agent Jackson during the January 14, 2012 meeting:

> The undercover agents told Mack that, as a result of the police officer layoffs, they would be able to do more business in Miami and would "get rich" because Miami would be "wide open." Agent Jackson then confided in Mack that Miami was "new territory" for him and Tyson, and that they had "this many t-shirts coming through you know what I mean, we just want to make sure everything is right you know what I mean." Mack stated that he understood and respected that.

Id. at 920. The Eleventh Circuit noted "[a]lthough Mack did not say much during the meeting, '[a]n illegal agreement may be inferred from the conspirators' conduct and other circumstantial evidence.'" Id. (quoting Baptista-Rodriguez, 17 F.3d at 1374).

The Eleventh Circuit rejected Mr. Mack's "conten[tion] that there [wa]s no direct evidence of his knowledge that 't-shirts' [wa]s one of the many code words for drugs,"

noting that "Agent Jackson, who [wa]s an agent on the drug squad, testified that

't-shirts' was a very common word for cocaine 'not just [in] Atlanta, . . . but everywhere';

it was also a term [Agent Jackson] had used with Bryant in reference to the drugs

involved in this case." Id. at 920. The Eleventh Circuit reasoned that:

> In light of Mack's 16-year experience on the Miami-Dade police force, the
> jury could reasonably have inferred that Mack knew exactly what Jackson
> was referring to and that he knew that the indubitably criminal activity in
> which he was about to participate involved drugs.
>
> Finally, Bryant made numerous statements to the undercover agents
> assuring them that Mack knew everything. These statements likely
> bolstered the government's case against Mack on the drug charges.
> However, they are not necessary to sustain a guilty verdict. Even absent
> these statements, the cumulative effect of the circumstantial evidence
> discussed above is sufficient to show Mack's knowledge of the drugs.
> Accordingly, taken in the light most favorable to the verdict, we cannot say
> that the record reveals a lack of substantial evidence from which a
> factfinder could find guilt beyond a reasonable doubt.

Id. at 920-21 (footnotes omitted).

The Eleventh Circuit also determined that there was sufficient evidence to

support the firearm charge (Count 4). "The jury found Mack guilty of carrying a firearm

during and in relation to the drug trafficking crime, in violation of 18 U.S.C. § 924(c)"

and "Bryant and McLendon were found guilty of possessing a firearm in furtherance of

the drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and 2." Mack, 572 F. App'x

at 921. With respect to Mr. Mack, the Eleventh Circuit noted that:

> It [wa]s undisputed that Mack was carrying his firearm approximately two
> hours before the actual drug transportation. He knew of the illegal nature
> of the conspiracy, and he understood that his police officer status was a
> necessary condition to his participation in the deal. In light of this
> evidence, it was reasonable for the jury to conclude that Mack carried a
> firearm in relation to the drug trafficking conspiracy.

Id. at 922. As to Mr. Bryant and Mr. McLendon, the Eleventh Circuit concluded that

there was sufficient evidence to support their guilty verdicts for aiding and abetting in Mr. Mack's section 924(c) firearm offense. Id. at 924-25.

During the pendency of the appeal, the government disclosed to the defendants that Agent Jackson was under investigation for allegations arising out of his relationship with a former FBI confidential source. The former source was later identified as Mani Chulpayev. There is no record evidence that the case agent was aware of Agent Jackson's misconduct[5] prior to trial. The parties have stipulated that the two Assistant United States Attorneys who prosecuted the case were also unaware of Agent Jackson's misconduct prior to trial.

## C.    The Instant Motions for New Trial

On October 8, 2015, Mr. Bryant and Mr. Mack filed motions for new trial. See Bryant's Motion for New Trial (DE# 181, 10/8/15); Mack's Motion for New Trial (DE# 182, 10/8/15). On October 13, 2016, Mr. McLendon also filed a motion for new trial. See McLendon's Motion for New Trial (DE# 187, 10/13/15).

On November 2, 2015, the government filed an omnibus response to the defendants' motions for new trial. See United States' Omnibus Response to New Trial Motions Filed by Defendants Bryant [D.E. 181], Mack [D.E. 182], and McLendon [D.E.

---

[5] To the undersigned's knowledge the DOJ-OIG's investigation of Agent Jackson is still ongoing and Agent Jackson has not yet been charged with any crime or policy violation. Nonetheless, and for purposes of the instant motion, the government does not dispute some of the misconduct by Agent Jackson. See Government's Supplemental Memorandum (DE# 281 at 2-3, 7/25/15) (stating that "[w]hile Jackson has been neither charged nor convicted with doing [these alleged acts], a comprehensive review of the DOJ-OIG's investigation objectively revealed policy violations which the government did not contest for purposes of the evidentiary hearing.").

187] (DE# 191, 11/2/15) (hereinafter "Government's Omnibus Response").[6] The defendants filed replies to the Government's Omnibus Response on November 16, 2015. See Defendant Henry Lee Bryant's Reply to the Government's Omnibus Response to the Motions for New Trial (DE# 195, 11/16/15) (hereinafter "Bryant's Reply"); Defendant Mack's Reply to United States' Omnibus Response to New Trial Motions [DE191] (DE# 194, 11/16/15) (hereinafter "Mack's Reply"); Defendant McLendon's Reply to Response to Motion for New Trial, Discovery, and Evidentiary Hearing (DE# 196, 11/15/16) (hereinafter "McLendon's Reply"). On January 11, 2016, the government filed a Notice of Filing Supplemental Authority (DE# 202, 1/11/2016).

On May 31, 2016 and June 2, 2016, the Court held an evidentiary hearing. The defendants called Baltimore Police Detective KayTee Tyson (hereinafter "Detective Tyson"), FBI Special Agent Matthew Fowler (hereinafter "Case Agent Fowler") and Department of Justice Office of Inspector General Special Agent Susan Howell (hereinafter "Agent Howell") as witnesses. See Transcripts (DE# 257, 6/7/16; DE# 268, 6/22/16).[7]

Following the evidentiary hearing, the Court allowed the parties to file supplemental briefs. On June 30, 2016, Mr. Mack filed a Memorandum of Law in Support of Defendant Daniel Mack's Motion for New Trial and Motion to Vacate (DE# 272, 6/30/15) (hereinafter "Mack's Supplemental Memorandum"). Mr. McLendon filed

---

[6] On December 3, 2015, the government filed a notice correcting a sentence in its omnibus response. See Notice of Filing (DE# 197, 12/3/15).

[7] Mr. McLendon sought to call Agent Jackson as a witness at the evidentiary hearing. Following a status hearing on June 16, 2016, the parties stipulated to certain facts on the record and Mr. McLendon withdrew his request for Agent Jackson's testimony. See Order (DE# 261, 6/16/16).

his post-hearing memorandum on July 1, 2016. <u>See</u> Defendant McLendon's Supplemental Memorandum of Law (DE# 276, 7/1/16) (hereinafter "McLendon's Supplemental Memorandum"). On July 2, 2016, Mr. Bryant filed his supplemental memorandum. <u>See</u> Defendant Bryant's Supplemental Memorandum in Support of his Rule 33 Motion for a New Trial (DE# 277, 7/2/16) (hereinafter "Bryant's Supplemental Memorandum").

The government filed its supplemental memorandum on July 25, 2015. <u>See</u> United States' Supplemental Memorandum of Law in Opposition to Defendant's Motions for New Trial (DE# 281, 7/25/15) (hereinafter "Government's Supplemental Memorandum"). Mr. Mack and Mr. McLendon filed their supplemental replies on September 6, 2016. <u>See</u> Defendant Mack's Reply to United States' Supplemental Memorandum of Law (DE# 289, 9/6/16) (hereinafter "Mack's Supplemental Reply"); Defendant McLendon's Reply to Government's Response to Defendants' Supplemental Memoranda of Law (DE# 290, 9/6/16) (hereinafter "McLendon's Supplemental Reply"). Mr. Bryant did not file a supplemental reply. This matter is ripe for adjudication.

**<u>FACTS</u>**

**A.      The Criminal Investigation**

Haim Turgman was the owner of Club Dolce, a Miami Beach nightclub. In the summer of 2011, Mr. Turgman complained to the FBI about numerous Miami Beach code enforcement inspectors who were demanding payment in exchange for overlooking code violations. Based on Mr. Turgman's assertions, the FBI began an investigation into the allegations of extortion by these code enforcement inspectors. As part of its investigation, the FBI took over the operation of Club Dolce. The FBI used an

9

undercover employee, Agent Jackson, to pose as the manager of the nightclub and make bribe payments to the corrupt code enforcement inspectors. Mr. Bryant, a fire inspector, was one of the code enforcement inspectors who had been extorting money from Club Dolce.[8]

At some point, the FBI changed the focus of its investigation from an extortion investigation to a narcotics investigation. The decision to change the focus of the investigation was made by Case Agent Fowler and other Miami agents. It was not made by Agent Jackson.

The FBI's investigation included telephone records, recorded telephone calls, audio and visual recordings of meetings at Agent Jackson's office in Club Dolce,[9] meetings at restaurants and surveillance of the transport of sham cocaine on two occasions. The substance of these meetings is discussed below in the summary of the evidence presented at trial. The FBI's investigation concluded in late January 2012.

There is no record evidence that Mani Chulpayev was involved in the investigation or prosecution of Mr. Bryant, Mr. McLendon and Mr. Mack. Additionally, there is no record evidence of Agent Jackson's misconduct prior to the conclusion of the investigation in late January 2012.[10]

_____

[8] Mr. Bryant pled guilty to conspiracy to commit extortion under color of official right, in violation of Title 18, United States Code, Section 1951(a) and was sentenced to a 27-month term of imprisonment to run concurrently with the term of imprisonment imposed in the instant case. See United States v. Bryant, Case No. 12-cr-20279-RNS.

[9] The audio/visual equipment failed to record a meeting on December 2, 2011 between Agent Jackson and Mr. Bryant.

[10] The focus of the DOJ-OIG's investigation into Agent Jackson's misconduct was from January 2012 through April 2013.

**B.      The Evidence Presented at Trial**

On December 2, 2011, Agent Jackson had a meeting with Mr. Bryant at Club

Dolce. The audio/visual equipment failed to record that meeting.

On December 4, 2011, Agent Jackson had a follow up meeting with Mr. Bryant at

Club Dolce. The December 4, 2011 meeting was audio/visually recorded.[11] During this

meeting Mr. Bryant reported that he had recruited police officers to provide assistance,

stating: "I got four and they said that they could give whoever I need. They all county

guys. Plus, I got two Beach guys." Trial Transcript (DE# 145 at 17-18, 1/14/13).

On December 9, 2011, Agent Jackson and Mr. Bryant met at Club Dolce. During

this meeting, Mr. Bryant told Agent Jackson that he had two police officers who would

provide security for the transportation of drugs. See Government's Exhibit 53 at Tab C,

Transcript of 12/9/11 Meeting at 5-6.[12] Mr. Bryant stated that his "brother," meaning Mr.

McLendon, would be involved. Id. at 5-6, 10-11. Specifically, Mr. Bryant stated that Mr.

McLendon was "gonna ride with me. He's gonna be pickin' up the bag, with me." Id. at

10. Mr. Bryant further stated that Mr. McLendon was "being sort of the escort guy for"

Mr. Bryant because he and Mr. McLendon had "worked it out many times before and

that[ was] the easiest way." Id. at 11.

---

[11] The video of the December 4, 2011 meeting was played at trial, but not at the
evidentiary hearing. See Government's Supplemental Memorandum (DE# 281 at 9,
7/25/15); Trial Transcript (DE# 145 at 16-17, 1/14/13).

[12] The defendants maintain that they believed they were transporting money, not
drugs. During the December 9, 2011 meeting with Mr. Bryant, Agent Jackson referred
to the drugs as "keys," "kilos" and twice used the word "cocaine." See Government's
Exhibit 53 at Tab C, Transcript of 12/9/11 Meeting at 7-8, 20, 21-22. Thus it is clear, at
least with respect to Mr. Bryant, that Mr. Bryant knew he was being paid to transport
drugs. The extent of Mr. McLendon and Mr. Mack's knowledge of the drugs is
discussed below.

During this meeting, Agent Jackson used the words "keys" and "kilos" to refer to the drugs being transported:

> [Agent Jackson]: Exactly, I wanted, that's kind of why I wanted to meet your guys, and make sure every, cause we've done this before in Vegas, and we had some sh*t pop off because what we found out was, the guy we were payin' wasn't payin' his guys properly. And then [SC][13]
>
> [Henry Bryant]: Well see, that, we had already discussed, my guys had already discussed that part [SC]
>
> [Agent Jackson]: Well, what, what, how, what's the going, what's the going rate here? I mean, what are they, kind of, what are they, what, what kind of numbers are they throwin' out to you, and we can kind of figure out what's what. **Cause right now it's ten keys [PH], I mean that's what's gonna be moving**.
>
> [Henry Bryant]: Okay.
>
> [Agent Jackson]: Just so you know. Uh, **it's ten kilo's**.
>
> [Henry Bryant]: **Okay**.
>
> [Agent Jackson]: **Uh, that's what's gonna be movin.'**
>
> [Henry Bryant]: **Okay.**

Government's Exhibit 53 at Tab C, Transcript of 12/9/11 Meeting at 7-8 (emphasis and footnote added). Agent Jackson also referred to the drugs as cocaine:

> [Agent Jackson]: Now, now, let me, right now we're only dealing with **ten keys** [PH].
>
> [Henry Bryant]: Okay.
>
> [Agent Jackson]: So um, it's not a incre-, incredible amount of **cocaine**, I mean so it ain't a ton. Know what I mean?
>
> [Henry Bryant]: I understand, I understand.

_____

[13] The abbreviation "[SC]" stands for "Simultaneous Conversation." See, e.g., Government's Exhibit 53 at Tab D, Transcript of 12/10/11 Phone Call.

Id. at 20. (emphasis added).

In explaining why he was offering to pay the officers $3,500 each, Agent Jackson

cited a downturn in cocaine prices:

> [Agent Jackson]: So, and, and the amount of money on **cocaine** prices
> isn't what it used to be as far as you know, [SC]
>
> [Henry Bryant]: Yeah.
>
> [Agent Jackson] . . . making up the difference and all that, so. My guys
> gotta be . . you know what I'm sayin?' Cause, I got to pay you, I got to pay
> the two runners, you know, before it's over with, you know, we twelve,
> twelve out [of] the whole and we only makin' cer- a certain amount of
> profit. You know what I mean? So, I'm not tryin,' tryin,' to short change you
> or anythin' but I want you to, you to get taken' and I want those two guys,
> you orchestrated the whole thing, you know what I mean?
>
> [Henry Bryant]: Right.

Government's Exhibit 53 at Tab C, Transcript of 12/9/11 Meeting at 21-22 (emphasis

added). Mr. Bryant told Agent Jackson that his "brother" (Mr. McLendon) would receive

half of what Mr. Bryant was paid and stated:

> because that's why I told him, I said listen your takin' just as much with
> your ass on the line as I am . . . And I said, you got just as much to lose
> as I do . . . I said, but you know, like I said, we've been in this thing
> together for, since we've been eight years old.

Id. at 22. Agent Jackson offered Mr. Bryant $4,000 to split with Mr. McLendon. Id. at 23.

On December 10, 2011, Agent Jackson called Mr. Bryant. See Government's

Exhibit 53 at Tab D, Transcript of 12/10/11 Phone Call at 2. During this phone call,

Agent Jackson used the word "dope" and Mr. Bryant abruptly hung up on him.

On December 15, 2011, Mr. Bryant met with Agent Jackson at Club Dolce and

expressed concern that their conversations could be overheard by law enforcement:

> [Henry Bryant]: Okay. The reason why I'm asking you stupid questions
> because I'm trying to figure out okay most of the time when we have

conversation[s], you know, when when you're in this type of field you don't have straight out conversations.

[Agent Jackson]: Mhm.

[Henry Bryant]: The reason why that is is because everybody knows that you can be almost bugged anywhere and the problem with that is is that if you picked up, if you picked up a bug you know any little word that you say can be conscruted [sic] as conspiracy, can be conscruted [sic] as ok well this is one of the players with regard to major, minor whatever the case may be and then that's when you pick up tails. You know.

[Agent Jackson]: Mhm.

[Henry Bryant]: That's why you got a dial tone.

Government's Exhibit 53 at Tab E, Transcript of 12/15/11 Meeting at 3.

Mr. Bryant explained that the reason he hung up on Agent Jackson was because

of the word Agent Jackson had used:

[Henry Bryant]: Well, well the, the word the word that you caused to trigger the hang up on was the Coca Cola word.

[Agent Jackson]: Oh okay.

[Henry Bryant]: And you said it outright and I'm like what the f**k?

[Agent Jackson]: I said that, outright?

[Henry Bryant]: Yeah and I was like what the f**k is he thinking?

[Agent Jackson]: Cause usually I say t-shirts or

[Henry Bryant]: No, you, no

[Agent Jackson]: I said it, said it straight out?

[Henry Bryant]: Straight out and that's why you got the dial tone.

Government's Exhibit 53 at Tab E, Transcript of 12/15/11 Meeting at 4. During this

exchange, Agent Jackson told Mr. Bryant that he usually used the word "t-shirts." Id.

Agent Jackson was the only person who testified at trial that the word "t-shirts" was a

14

code word for cocaine.

Detective KayTee Tyson was brought into the investigation as an undercover agent.[14] He played the role of a drug dealer from the Northeast who was the owner of the drugs that would be transported from Club Dolce. On December 21, 2011, Agent Jackson met Mr. Bryant at a restaurant in Miami Beach. During this meeting, Agent Jackson introduced Detective Tyson to Mr. Bryant.

Later that day, Mr. Bryant arrived at Agent Jackson's office in Club Dolce with Mr. McLendon. The purpose of this meeting was for Mr. Bryant and Mr. McLendon to pick up the sham cocaine which they would be delivering to a parked car in the Aventura Mall parking lot. During this meeting, Mr. McLendon expressed concern about using a route which would require them to pass through a SunPass tollbooth:

[Mr. McLendon]: This right there is uh what you call that sh*t? Sunpass.

[Agent Jackson]: Right.

[Mr. McLendon]: Don't want that.

[Henry Bryant]: Cause it takes pictures.

[Mr. McLendon]: So, the best way is Collins [Avenue].

Government's Exhibit 53 at Tab F, Transcript of 12/21/11 Meeting at 9.

During this meeting, the following exchange took place:

[Detective Tyson]: **We need to make sure that all nine of these get there**.

[Henry Bryant]: Don't worry about that. Do what you do.

[Detective Tyson]: Yeah I know you['re] saying don't worry about that but I got to be worried about that.

---

[14] Detective Tyson worked with Agent Jackson on a total of five cases and considers Agent Jackson a friend.

[Henry Bryant]: (SC) I understand but . . . you gonna be right behind me so don't worry . . . about it . . .

[Detective Tyson]: Cause **this money** see what am saying . . .

[Henry Bryant]: I understand, I understand, I understand. (Pause) I have no problem with that . .

Government's Exhibit 53 at Tab G, Transcript of 12/21/11 Meeting at 10 (emphasis added). At trial Detective Tyson explained that when he stated "[w]e need to make sure that all nine of these get there," he was talking about that nine kilograms of cocaine.

See Trial Transcript (DE# 145 at 194, 1/14/13). He explained his "this money" comment as follows:

What I'm implying that this is money, meaning that these nine kilograms of cocaine is worth a lot of money to me. So I need to make sure that when I'm giving them to you, that they need to get there. No ifs, ands, or buts about it. If you're telling me that you can do it, you need to be able to go through with it.

Id. Detective Tyson testified that nine kilograms of cocaine was worth approximately $300,000. Id.

Detective Tyson proceeded to mark the nine "bricks"[15] of sham cocaine with a

----

[15] At trial, Detective Tyson testified that this was the manner in which cocaine was packaged:

Q. When, if ever, have you seen money packaged in this manner?

A. You would never see money packaged in that manner.

Q. Why?

A. For one, it's money. When you're delivering money to anyone, people want to make sure that what they're getting there is money. So if I'm delivering you some money, I'm not wrapping it up, covering and concealing it, because whoever I'm giving it to, the first thing they're going to say is, is this really what --

marker and handed each one to Agent Jackson to place in a duffel bag resting on top

of a desk.[16] This handoff took place in Mr. Bryant and Mr. McLendon's presence. See

---

\*\*\*

> THE WITNESS: You really want to count what you're getting. You just
> don't want someone to hand you something wrapped up in a shape of
> cocaine or the shape of something that you don't know what it is.
>
> So because if you give that to them, then what's to say that what's in that
> package is actually money?

\*\*\*

> Q. I'm showing you a part of Government's Exhibit Number 19.
> When, if ever, have you seen money packaged that like?
>
> A. Never.
>
> Q. What is packaged like that in your training and experience?
>
> A. Cocaine and heroin.
>
> Q. What does that represent?
>
> A. A kilogram.
>
> Q. Why is it packaged in kilograms?
>
> A. When you're doing a large amount, typically the person is trying to
> make as much money off of it as they can. So the average drug dealer,
> the first thing they try to do is try to make it to a kilo. If they can make it to
> a kilo, they know that they can take that money and flip it and make
> another or buy other kilos off of it.
>
> So in order -- it wouldn't be worth my time to come all the way down here
> to Miami to be moving anything less than a kilo.

Trial Transcript (DE# 145 at 201-203, 1/14/13). Detective Tyson also testified that
based on his experience, you would not leave large sums of money in a parked car in a
mall parking lot in the drug business. Id. at 203-204.

[16] At trial, Detective Tyson explained why he marked the bricks:

Government's Exhibit 9 at Clip 2 (Video Clip).

Detective Tyson told Mr. Bryant and Mr. McLendon that the bricks needed to arrive at their destination exactly as they were packaged: "How they how they are now, I need to get a phone call later that's how they need to be when they pick em up." Government's Exhibit 53 at Tab G, Transcript of 12/21/11 Meeting at 11. Mr. Bryant and Mr. McLendon then moved towards the desk where the duffel bag was resting so they could get a closer look at the bricks inside the duffel bag. Mr. McLendon stated, "Come in here for a second, I want you all to see how they is so I know exactly. We were here, we're here to do our job that's it." Government's Exhibit 53 at Tab G, Transcript of 12/21/11 Meeting at 11; Government's Exhibit 9 at Clip 2, (Video Clip).

Detective Tyson again emphasized to Mr. Bryant and Mr. McLendon that he wanted the bricks to arrive exactly as they were packaged:

[Detective Tyson]: So how they are now that's how they got to be.

[Octavius McLendon]: That's how they will be[.]

[Detective Tyson]: **No deviation, no taste, neither one of y'all get high right?**

[Octavius McLendon]: **Pstt.**

[Detective Tyson]: **Alright just saying you, I gotta ask that question.**

Government's Exhibit 53 at Tab G, Transcript of 12/21/11 Meeting at 11 (emphasis

---

With the marker what I was trying to do with the kilos were put initials on them, just to imply that, look, I'm putting this mark on them, putting this mark on them, so when they get to where they're going to, that's how they better arrive. So if this marker is gone off of there, then I know that something happened to the kilos because that's not how I gave them to you.

Trial Transcript (DE# 145 at 194, 1/14/13).

added). Agent Jackson then handed the duffel bag to Mr. Bryant. See Government's Exhibit 9 at Clip 2, (Video Clip). Mr. Bryant and Mr. McLendon left Agent Jackson's office with the duffel bag.

At trial Detective Tyson explained why he asked Mr. Bryant and Mr. McLendon if either of them "get high:"

> That question was for, to make sure that -- I didn't want a person that gets high to transport my drugs for me, because at that point they could decide to go in, take some more, test it for themselves to see what it was, if it was good, if it wasn't.
>
> So I wanted to make sure that, look, I'm telling you already not to go into them. So I'm making sure now, you don't get high, so it won't be no discrepancy with or any problems with getting to the point they need to get to.

Trial Transcript (DE# 145 at 196, 1/14/13). Detective Tyson testified that Mr. Bryant and Mr. McLendon "were like insulted" by that question. Id.

At approximately 7:38 PM on December 21, 2011, Mr. Bryant and Mr. McLendon returned to Agent Jackson's office at Club Dolce. See Government's Exhibit 9 at Clip 3, (Video Clip). Detective Tyson tossed to Mr. Bryant bundles of cash totaling $10,500. Id.; see also Trial Testimony (DE# 145 at 198, 1/14/13). Mr. Bryant and Mr. Tyson counted the money in Agent Jackson's office. See Government's Exhibit 9 at Clip 3, (Video Clip).

The police car that assisted Mr. Bryant and Mr. McLendon in making the December 21, 2011 delivery was assigned vehicle number 1929A. This was the same vehicle number that was assigned to Mr. Mack's police car. See Government's Exhibit 33, Trial Transcript (DE# 145 at 184, 1/14/13). Mr. Bryant and Mr. Mack exchanged text messages and met up on December 21, 2011. See Government's Exhibit 35d, Metro

19

PCS Subscriber Information.[17]

On the morning of January 14, 2012, Agent Jackson, Detective Tyson and Mr. Bryant were outside a restaurant. This was the first time that Agent Jackson and Detective Tyson would be meeting Mr. Mack. While they were waiting for Mr. Mack to arrive, the following exchange took place between Agent Jackson and Mr. Bryant:

> [Agent Jackson]: So, what's the, what's the story? So we can get this thing moving?
>
> [Henry Bryant]: Well, I'm ready to go. He'll be here in two minutes.
>
> [Agent Jackson]: Alright, so what you was talking about? Cause we can talk now, you know. On the phone you was saying something about.
>
> [Henry Bryant]: **What, what I'm saying is, is that, he knows exactly what we're doing. So, so there's no secrets to him.**
>
> [Agent Jackson]: Okay.
>
> [Henry Bryant]: **You know, the only thing about it is, is that, his thing of it is that, the, the less he knows, the better off he is.**
>
> [Agent Jackson]: Right, right, right.

Government's Exhibit 53 at Tab I, Transcript of 1/14/12 Meeting at 5 (emphasis added).

Agent Jackson expressed concern about whether Mr. Mack knew what was going on and Mr. Bryant assured Agent Jackson that Mr. Mack was aware:

> [Henry Bryant]: So, he's only a minute away, oh I was gonna say, what the f*ck I do with my phone.
>
> [Agent Jackson]: Yeah cause you had me a little worried when you was, like . . .
>
> [Henry Bryant]: No, no, no, no. But, . . .

---

[17] The jury did not find Mr. Mack guilty of attempting to possess with intent to distribute cocaine with respect to the December 21, 2011 delivery. See Verdict (DE# 86 at 2, 10/11/12).

[Agent Jackson]: . . . you was like, . . .

[Henry Bryant]: . . . I'm not gonna sit there and talk in front of LEOs

[Agent Jackson]: you know no, no, no. You was like, he do, but he don't know. That's all I was . . .

[Henry Bryant]: No, no, no, no, he, **he knows about it**.

[Agent Jackson]: Oh.

[Henry Bryant]: But, like I said, the less . . .

Government's Exhibit 53 at Tab I, Transcript of 1/14/12 Meeting at 7-8 (emphasis added).

Mr. Mack arrived in his police car (vehicle number 1929A). He wore his full police uniform but no name tag. See Trial Transcript (DE# 145 at 206, 1/14/13). Mr. Bryant introduced Mr. Mack using the pseudonym "James." Id. Mr. Mack was wearing his sidearm. Id.

The restaurant was crowded that morning and so they moved their meeting to another restaurant. See Trial Transcript (DE# 145 at 207, 1/14/13). Detective Tyson and Mr. Bryant rode together to the second restaurant. Id. at 207-208. During the car ride, Mr. Bryant expressed concern to Detective Tyson about the December 10, 2011 phone call when Agent Jackson used the word "dope." Government's Exhibit 53 at Tab J, Transcript of 1/14/12 Meeting at 9-10. Mr. Bryant also relayed to Detective Tyson his past experience: "Well, what, what I'm saying is, these guys, these guys used to move, we talkin' about **kiloton** . . . . You know what I'm saying? And, I've been doing this since I've been a f*cking shorty." Id. at 10 (emphasis added). Detective Tyson explained to the jury that Mr. Bryant meant, he'd moved a lot of cocaine and that he'd been doing

this for a long time. See Trial Transcript (DE# 145 at 214, 1/14/13). During the car ride,

Mr. Bryant also relayed to Detective Tyson, Mr. McLendon's role:

> You understand what I'm saying? And that's the reason why he's so important. The other part of that is, the reason why he's so important is, is because we're carrying, we're carrying not only weight, we're carrying weapons as well. . . . And I don't make that no secret. I tell 'em everywhere I go, just like my, my guys carry weapons. I got my weapons on me."

Government's Exhibit 53 at Tab J, Transcript of 1/14/12 Meeting at 12. Mr. Bryant also

gave assurances to Detective Tyson that Mr. Mack knew what was going on:

> [Detective Tyson]: Well, like I said, **let's just you saying everybody knows, everybody knows because, you know, I can't take that risk that you say**…
>
> [Henry Bryant]: **I understand. I understand**.
>
> [Detective Tyson]: **If this dude know but he don't know that he get there and like well, yo, I ain't down for that. And, then, he rolls out, then we jammed**. I ain't…
>
> [Henry Bryant]: **No, no**.
>
> [Detective Tyson]: … I can't deal with you no more if that was that.
>
> [Henry Bryant]: Right. No. That's not, ha, **but that's why I brought my guys to meet you**.
>
> [Detective Tyson]: Okay. Alright.
>
> [Henry Bryant]:  **You understand what I'm saying? 'Cause normally, my guys don't show faces at all. None of them**.
>
> [Detective Tyson]: Right, right.
>
> [Henry Bryant]:  **And this guy here has more to lose than anybody else, 'cause he's a sergeant**.[18]

---

[18] Mr. Mack states that he was not a sergeant. See Mack's Supplemental Reply (DE# 289 at 17 n.5, 9/6/16).

[Detective Tyson]: Okay.

[Henry Bryant]:  You understand? 'Cause he's got his guys up underneath him. **That's why I brought him, instead of the little guy. Because whatever I say to him, goes, period**.

[Detective Tyson]: Right.

[Henry Bryant]: **And he makes it happen. Just like last time he made it happen.**

[Detective Tyson]: Okay.

[Henry Bryant]: But, I, I said that, you know,

[Detective Tyson]: And that's, that's, you know, I mean, that's, the part of cause that's for you to work out.

[Henry Bryant]: Right.

[Detective Tyson]: **I just wanted make sure that they know**.

[Henry Bryant]: **They do know**. And, like I said…

[Detective Tyson]: That's what I'm saying.

[Henry Bryant]: … **that's the reason why I'm telling you that they know and then you can talk to them to make sure he knows. 'Cause I don't have a problem with that**.

[Detective Tyson]: Alright, well tell …

[Henry Bryant]: But, but, I wanted to make,

[Detective Tyson]: On my own, **they need to know exactly what it is because if you, if you got somebody that's coming that don't know and at the end, and at the end of the day, the Friday like I ain't come, I can't do. Everything is done. Now I'm, now I'm jammed up because now I'm looking at you sideways**.

[Henry Bryant]: **Right**.

[Detective Tyson]: **Because, oh, we bring somebody don't know**.

[Henry Bryant]: Right.

[Detective Tyson]: It's all supposed to be worked out. **I can't risk somebody not knowing and trying to show up then turn around and say, no, I can't do it**. Then, now, they know who I am.

[Henry Bryant]: Right. Well, that's …

[Detective Tyson]: I can't, I can't have them know who I am.

[Henry Bryant]:  … that was …

[Detective Tyson]: That was the whole, that was the whole thing where I like, yo,

[Henry Bryant]:  …that was…

[Detective Tyson]:   … I told him, say, yo, I need to know who these people are to make sure they on board for real.

Id. at 16-17 (emphasis and footnote added).

Agent Jackson, Detective Tyson, Mr. Bryant and Mr. Mack sat at a table at the

second restaurant. At trial, Detective Tyson described the purpose of the meeting as

follows:

Q. Now, what was the purpose of this meeting?

A. The purpose of this meeting was for Henry [Bryant] to introduce other members of his team, specifically law enforcement that will be escorting the drugs from our club to the drop car.

Q. Why is it important for the drug dealers to meet the law enforcement?

A. Well, for us in this situation, **in this role, it was important for me to meet him, well, because once I know that this guy knows exactly what he's doing, so if we get caught, he's just in trouble as we are**, but we needed that law enforcement's presence, so that if we would get pulled over or the car was to get pulled over, that they could intervene. You know, say they are doing something or they're doing some kind of investigation just to throw the regular cops off from stopping our vehicle.

Q. And so based on your experience, when, if ever, would someone who's

24

transporting cocaine on behalf of someone else invite a cop to a meeting with the people he's transporting cocaine for?

A. Never, really.

Q. **What would it indicate to you?**

A. **That this cop, he's dirty**.

Trial Transcript (DE# 145 at 209, 1/14/13) (emphasis added).

During this meeting, Detective Tyson reiterated the importance of everyone having the same knowledge of the transaction:

[Agent Jackson]: Yeah, so we appreciate you getting with us.

[Daniel Mack]: Not a problem.

[Agent Jackson]: **You know, what I'm saying, with things like they are you know, we gotta make sure, everybody good you know what I mean. So, you don't want you don't want no mistakes when you know things like this in order you know what I mean? Everybody gotta be move as one, you know what I mean**.

[Daniel Mack]: **That's true**.

[Agent Jackson]: So, **that's one of the main thing**, we just wanted…

[Detective Tyson]: The thing, the thing is, that's my, that's my man that's my man of my man, alright? Can't have them go down without me, cause I'm a use the (UI) make sure the thing is straight. The reason **why I was stressing you know cause we gotta make sure everybody is on the same, on the same point, on the same tuning**. **Because, if somebody get there and all of sudden decide to change their mind, I'm f*cked.** Ain't nothing going down. I ain't dealing with Yo, I'm cutting everybody off.

[Daniel Mack]: **Right.**

[Detective Tyson]: '**Cause I can't risk that I'm coming down here, this suppose to be set up and everybody on point till somebody get there and they feeling a little shaky**, like, well, I don't wanna do this now, whatever. Well, then, they say, they gonna roll out, they roll out, I'm done and that's it. I can't deal with Yo, I ain't, I can't have him call (UI). I can't

have him contact you no more because now, they know who I am. If we know all we all know each other. If that person decides to go somewhere else, that's like, yo, he, he plan on robbing me. He plan on taking something from me.

[Daniel Mack]: **You right**.

[Detective Tyson]: So, I can't get down like that. So, if you got somebody that ain't, that ain't gonna keep it hundred trying to roll the honey with, ain't nobody, ain't nothing going down. It ain't doing nothing. Ain't nothing ain't nobody making no moves. Ain't nobody making no money. It ain't nothin' happenin'. That's, that's just the bottom line. I, I, no, I ain't try to come off as more hard but, I got business I gotta do. You know what I mean?

[Daniel Mack]: I don't think it's hard, I think is firm. So, I'm not worried about that.

[Agent Jackson]: Yeah.

[Detective Tyson]: So that's, that's, that's the bottom line. If, if somebody ain't right, ain't nothing going down. Walk away nice to meet y'all. If y'all see me come through, don't give me no ticket.

(Laughter)

[Detective Tyson]: That's it, that's it, you know, no hard…

[Daniel Mack]: You got my one spot and you ain't gonna be riding in it.

(Laughter)

[Detective Tyson]: No, ain't no hard feelings.

Government's Exhibit 53 at Tab K, Transcript of 1/14/12 Meeting at 23-24 (emphasis added).

Detective Tyson and Mr. Mack also discussed police officers in Miami being laid off. See Government's Exhibit 53 at Tab K, Transcript of 1/14/12 Meeting at 37-39. Mr. Mack told Detective Tyson and Agent Jackson that the police department was "slated to lose a hundred and fifty-four people at the end of the month" and that they were already down 600. Id. at 39. Detective Tyson stated, "[w]e ready to get rich," in response to the

news that there were a significant number of police layoffs. Id. at 39. Detective further

stated, "Nobody down here be working. We can, be here all the time." Id. Agent

Jackson stated "It's gonna be wide open." Id.

At trial, Detective Tyson explained his remarks as "[m]eaning that I was going

back home to tell my boss that, look, all the drugs, whatever we need to move through

here, we good to go. Police getting laid off down here." Trial Transcript (DE# 145 at

220, 1/14/13).

Detective Jackson walked out of the restaurant with Mr. Mack and the following

conversation took place:

> [Agent Jackson]: You know what I'm saying, trying to make it work and
> you know, if you don't like the way something going or you know, let us
> know cause **this new territory for us** you know.
>
> [Daniel Mack]: Okay.
>
> [Agent Jackson]: So, you know, we got this many, this many **t-shirts**
> coming through you know what I mean, we just want to **make sure**
> **everything is right you know what I mean**.
>
> [Daniel Mack]: I don't hate, so that's why I respect and understand
> everything that he mentioned.
>
> [Agent Jackson]: Right, cause ain't nobody trying to get locked up you
> know what I mean, you hear me.
>
> [Daniel Mack]: You know how they do us.
>
> [Agent Jackson]: . . . You hear me[.]
>
> [Daniel Mack]: . . . They do (UI)
>
> [Agent Jackson]: Hey, hey, hey, it ain't gonna be no question, you know
> what I mean, they gonna do us bad, you know what I mean, like "you got
> how many on you?"
>
> [Daniel Mack]: You right. Be safe to you man.

27

Government's Exhibit 53 at Tab L, Transcript of 1/14/12 Meeting at 61 (emphasis added).[19]

In the afternoon of January 14, 2012, Mr. Bryant and Mr. McLendon arrived at Agent Jackson's office in Club Dolce. See Government's Exhibit 13 at Clip 1 (Video Clip). Agent Jackson placed a duffel bag on his desk and proceeded to fill the duffel bag with ten "bricks" of sham cocaine in Mr. Bryant and Mr. McLendon's presence. Mr. McLendon counted the bricks and commented that he "appreciated the smaller [bag] size" because it had "[b]etter maneuverability, less attention getter too." Government's Exhibit 53 at Tab L, Transcript of 1/14/12 Meeting at 3. Agent Jackson handed the duffel bag containing the sham cocaine to Mr. McLendon. Mr. Bryant and Mr. McLendon confirmed their plans with Detective Tyson and Agent Jackson concerning where to deliver the duffel bag. See Government's Exhibit 13 at Clip 1 (Video Clip). Mr. Bryant and Mr. McLendon then left Agent Jackson's office. Id.

Surveillance photographs taken on January 14, 2012 show a marked police vehicle with the number 1929A painted on it (Mr. Mack's police vehicle) following Mr.

---

[19] As previously noted, Agent Jackson was the only witness at trial who testified that the word "t-shirts" was commonly understood to mean cocaine:

Q. And you also say, "This many, this many T-shirts coming through." What are you talking about there?

A. The cocaine. I was very specific with the term I used just because of the previous event that happened with Henry Bryant, and I worked drugs in Atlanta. That's what I do. I'm an agent on the drug squad. **And T-shirts is a very common drug term used in Atlanta for drugs. So that's the terminology I knew to use**.

Trial Transcript (DE# 145 at 93, 1/14/13) (emphasis added). During cross-examination, Agent Jackson clarified that the code word "t-shirts" was used "[n]ot just Atlanta . . . but everywhere." Id. at 115.

Bryant and Mr. McLendon's car. See Government's Exhibit 39a-d. The duffel bag was delivered to a parked car in a parking lot on January 14, 2012. See Government's Exhibit 20a-d. Mr. Bryant and Mr. McLendon then returned to Club Dolce to collect a cash payment for the delivery of the sham cocaine. See Government's Exhibit 13 at Clips 2 and 3 (Video Clips).

## C.   The DOJ-OIG's Investigation of Agent Jackson

In April 2013, the Department of Justice Office of Inspector General ("DOJ-OIG") began its investigation of Agent Jackson.[20] As part of its investigation, DOJ-OIG obtained documents and interviewed witnesses. The focus of the DOJ-OIG investigation was Agent Jackson's improper relationship with former FBI registered source Mani Chulpayev. The relevant time frame of the investigation was from January 2012 through April 2013.[21]

Mr. Chulpayev was a Russian mobster based in New York. In the late 1990s, he was arrested for crimes he committed in New York. Mr. Chulpayev was convicted and sentenced to a term of imprisonment. He cooperated with the government and, for a time, was an FBI source.

In the mid-2000s, while serving as an FBI source, Mr. Chulpayev was involved in vehicle-related crimes, including stolen vehicles, vehicle identification number ("VIN") fraud and subleasing. He was convicted and served a term of imprisonment.

---

[20] The investigation was first assigned to Agent Phil Van Nimwegen, an agent in Atlanta. In November 2013, Agent Susan Howell took over the investigation.

[21] At the evidentiary hearing, Agent Howell explained that DOJ-OIG's investigation into Agent Jackson's misconduct was limited to these dates because Agent Jackson received items of value from Mr. Chulpayev in May 2012 and Mr. Chulpayev was incarcerated in 2013.

In January 2010, Mr. Chulpayev became a registered source for the FBI in Atlanta. He remained a registered source until February 3, 2011.[22] During this time, Agent Jackson became Mr. Chulpayev's handler.

Mr. Chulpayev owned a luxury car rental business. Agent Jackson learned that, from time to time, Mr. Chulpayev would get in trouble with the local police because someone was either stopped in one of Mr. Chulpayev's cars or there was an issue related to the car's registration or VIN number.

### 1.  Agent Jackson's Investigation of Decensae White and Gary Bradford

In 2012, Agent Jackson was the case agent in an undercover narcotics investigation targeting suspected drug traffickers Decensae White and Gary Bradford. Mr. Chulpayev was assisting Agent Jackson with the undercover investigation. Mr. White was an associate of Mr. Chulpayev and had invested approximately $150,000 to $160,000 into Mr. Chulpayev's business.

The narcotics investigation originated out of Atlanta, but a meeting with Mr. White and Mr. Bradford was scheduled for Memorial Day weekend in Miami. Prior to traveling to Miami, Agent Jackson had prepared a memorandum to the FBI field office in Miami advising that he would be traveling to Miami. The memorandum stated that there would be an undercover agent involved in the investigation. It also stated that there was a source or a confidential source who would be making introductions. The memorandum did not identify the source by name. By that time, Mr. Chulpayev had not been a registered source for the FBI in over a year.

---

[22] Mr. Chulpayev was terminated as a registered source because he left the Atlanta area.

Detective KayTee Tyson was the undercover agent who participated in the investigation. Detective Tyson was playing the undercover role of a drug dealer. Detective Tyson flew to Miami to attend the Memorial Day weekend meeting. Mr. Chulpayev introduced Detective Tyson to Mr. White and Mr. Bradford at the meeting. Agent Jackson told Detective Tyson that Mr. Chulpayev was a source.

Agent Jackson provided Detective Tyson with a convertible BMW 6 Series[23] to use during his stay in Miami. Detective Tyson did not ask Agent Jackson where he got the car. It was not unusual for the FBI to provide high-end cars for Detective Tyson to use during an investigation. Detective Tyson later learned that this car had been provided by Mr. Chulpayev. Mr. Chulpayev had also provided Agent Jackson with a second convertible BMW 6 Series for Agent Jackson to use for that weekend. Agent Jackson was the case agent and had no need for a luxury automobile to support his role in the case. There is no evidence that Mr. Chulpayev was reimbursed by anyone for the use of those vehicles.

In addition to use of a convertible BMW 6 Series, Agent Jackson provided Detective Tyson with $1,500 in cash. Detective Tyson did not ask Agent Jackson where he got this money. It is not unusual for the FBI to provide undercover agents with cash to use during an investigation. During the DOJ-OIG investigation, Detective Tyson learned that the money came from Mr. Chulpayev. At some point, Agent Jackson sought reimbursement of the $1,500 from the FBI. Agent Jackson paid back that money to Mr. Chulpayev.

Under FBI policy, it is improper for an FBI agent to obtain use of vehicles and

---

[23] Agent Howell testified that the vehicle may have been a Mercedes.

money from a source. Detective Tyson was required to file an FBI-302 report in connection with his trip to Miami. He did not file the FBI-302 report until November 7, 2012, approximately five months later.

## 2. Agent Jackson's Involvement in the Vernell Murder Investigation

In April 2012, Melvin Vernell, an Atlanta-based rapper, was arrested for driving a stolen vehicle. Mr. Vernell had leased that vehicle from Mr. Chulpayev. Mr. Vernell intended to fight the charge and raise the defense that the vehicle was not stolen, it was leased from Mr. Chulpayev. Mr. Vernell's attorney, who was also Mr. Chulpayev's attorney, tried to present a copy of the lease agreement in court. The prosecutor wanted the attorney to produce the original lease agreement. Mr. Vernell's attorney called Mr. Chulpayev and Mr. Chulpayev was upset about being contacted by telephone in open court.

In June 2012, Mr. Chulpayev hosted a party in Miami to celebrate his birthday. He invited Decensae White. During the party, Mr. White confided in Mr. Chulpayev that he believed Mr. Vernell had stolen marijuana from Mr. White. Mr. White was upset with Mr. Vernell over the theft and wanted to know if Mr. Vernell was using one of Mr. Chulpayev's vehicles. Mr. White knew that Mr. Chulpayev's vehicles were equipped with GPS trackers. Mr. White wanted to locate Mr. Vernell. At some point, Mr. Chulpayev gave Mr. White either the password to the GPS login or the GPS coordinates for the vehicle driven by Mr. Vernell.[24]

---

[24] The record is inconsistent concerning whether Mr. Chulpayev provided to Mr. White the GPS password, the GPS coordinates to the hotel where Mr. Vernell was staying or the GPS coordinates to the hospital or hospital parking garage where Mr. Vernell was murdered. These factual discrepancies are not material for purposes of ruling on the instant motions.

On June 7, 2012, Mr. Vernell was murdered in a hospital parking garage in Sandy Springs, Georgia. Mr. Vernell was murdered in a vehicle leased from Mr. Chulpayev. At the time of his murder, Mr. Vernell's criminal case for driving a stolen vehicle was still open.

Mr. Chulpayev and Agent Jackson spoke on the telephone and exchanged text messages "a lot . . . before the murder [and] after the murder." Transcript (DE# 257 at 306, 6/7/16). Mr. Chulpayev told Agent Jackson that the Sandy Springs police were trying to interview him about Mr. Vernell's murder.[25] Mr. Chulpayev also told Agent Jackson that Mr. Chulpayev believed Mr. White was involved in the murder.

On June 11, 2012, Agent Jackson contacted the Sandy Springs Police Department and spoke with Detective J.T. Williams. Agent Jackson told Detective Williams that Agent Jackson had a source with information about who was involved in the murder. Agent Jackson also told Detective Williams that the source was Agent Jackson's source and that the source was more comfortable speaking with Agent Jackson because the source had had issues with local law enforcement in the past. Agent Jackson told Detective Williams that he was going to help the Sandy Springs Police Department, but he was not going to provide them with direct access to this source. Agent Jackson also told Detective Williams that there was a narcotics component to Mr. Vernell's murder and suggested that the murder investigation of Mr.

_____

[25] Agent Howell later testified that it was Mr. Chulpayev who was trying to contact the Sandy Springs Police Department because Mr. Vernell was murdered in one of Mr. Chulpayev's vehicles. See Transcript (DE# 257 at 311, 6/7/16). The order on the motion to suppress filed by Mr. Chulpayev in the state court proceeding states that Mr. Chulpayev contacted the Sandy Springs Police Department shortly after learning of the murder, identified himself and attempted to provide information pertinent to the vehicle and the investigation. See Government's Exhibit 63 at 2.

Vernell could possibly be turned into a federal investigation.

Agent Jackson notified his supervisors of Mr. Vernell's murder and met with the United States Attorney's Office in Atlanta. Agent Jackson told them that he would be investigating Mr. Vernell's murder, meaning the FBI was going to try to tie Mr. Vernell's murder in with the narcotics investigation. As part of its investigation into Mr. Vernell's murder, the FBI interviewed a witness in Alabama, obtained pen registers and tried to obtain a phone tap.

On July 30, 2012, Agent Jackson interviewed Mr. Chulpayev with an FBI task force officer present.[26] During the interview Mr. Chulpayev told Agent Jackson that he did not provide the GPS coordinates to the hospital parking garage where Mr. Vernell was murdered. Rather, Mr. Chulpayev provided the password for the GPS tracker and the password was used to trace Mr. Vernell to the hotel where he was staying.

In October 2012, Agent Jackson met with detectives at the Sandy Springs Police Department to discuss the murder investigation. Agent Jackson revealed to the Sandy Springs detectives for the first time that he had interviewed Mr. Chulpayev in July 2012. The detectives became upset with Agent Jackson for not disclosing this information. During this meeting, Agent Jackson also revealed that Mr. Chulpayev had provided the GPS coordinates to the hospital where Mr. Vernell was murdered. The Sandy Springs police detectives responded that if that was what Mr. Chulpayev had done, then Mr. Chulpayev was a co-conspirator to the murder. Agent Jackson then retracted his

---

[26] Agent Howell later testified that a third person, an FBI agent, was present in the room during Mr. Chulpayev's interview. See Transcript (DE# 257 at 319, 6/7/16). She also agreed with the government that all three officers – Agent Jackson, the task for officer and the FBI agent – interviewed Mr. Chulpayev. Id.

statement and said that what he meant was that Mr. Chulpayev had provided the GPS coordinates to the hotel where Mr. Vernell was staying.

On October 24, 2012, Agent Jackson allowed the Sandy Springs detectives to interview Mr. Chulpayev. Agent Jackson did not participate in that interview, but required the Sandy Springs Police Department to interview Mr. Chulpayev at the FBI office in Atlanta.[27]

On January 25, 2013, Agent Jackson called Detective Williams of the Sandy Springs Police Department and told Detective Williams he had to tell him something, but he wanted to keep it between them. Agent Jackson then disclosed to Detective Williams that Mr. Chulpayev was not an FBI source and had not been an FBI source for some time. As soon as the call ended, Detective Williams reported this information to his chain-of-command and it was ultimately reported to the FBI in Atlanta.

At some point, Mr. White, Mr. Bradford and two other individuals were arrested for the murder of Mr. Vernell. Mr. Chulpayev was also arrested and charged with various crimes arising from Mr. Vernell's murder. Mr. Chulpayev sought to suppress statements he provided to Agent Jackson and law enforcement officers. See Government's Exhibit 63. The court held a hearing on Mr. Chulpayev's motion to suppress. Id. at 5. Agent Jackson was called to testify at the suppression hearing. Id. Agent Jackson invoked his Fifth Amendment rights and did not provide testimony. Id. The court suppressed Mr. Chulpayev's statements made during the July 2012 interview with Agent Jackson and the October 2012 interview with the Sandy Springs detectives.

_____

[27] The order on the motion to suppress filed in Mr. Chulpayev's criminal case states that Agent Jackson entered the room towards the end of the interview. See Government's Exhibit 63 at 7 n.7.

Id. at 9-10. The court "conclud[ed] that Agent Jackson's involvement in procuring . . . [the] interview[s] significantly taint[ed] said interviews." Id.

### 3.    Agent Jackson's Interactions with Amanda Smith's Attorney

Mr. Chulpayev had used Amanda Smith as a straw buyer to purchase vehicles for his business. Ms. Smith would purchase luxury vehicles and allow Mr. Chulpayev to sublease them.  Under their agreement, Mr. Chulpayev would make the loan payments on the vehicles. When Mr. Chulpayev stopped paying loans, Ms. Smith hired an attorney.

In the summer of 2012, Agent Jackson called Ms. Smith's attorney on behalf of Mr. Chulpayev. Agent Jackson acted as an intermediary between the attorney and Mr. Chulpayev. Ms. Smith's attorney told Agent Jackson that Mr. Chulpayev's fraud had to be reported and that if Agent Jackson did not report the fraud, the attorney would report it to internal affairs. Agent Jackson told the attorney that he could have the attorney arrested for extorting a federal agent.

Under FBI policy, it is improper for an agent to contact someone on behalf of a source. It is also improper to threaten someone with arrest for seeking to make a report to internal affairs. Agent Howell testified that she believes Ms. Smith's attorney filed a civil suit against the FBI based on what occurred in the summer of 2012.

**4.    Items of Value Provided to Agent Jackson by Mr. Chulpayev**[28]

For purposes of the instant motion, the government does not dispute that Mr.

Chulpayev provided Agent Jackson with the following items of value which were

<u>unrelated</u> to Agent Jackson's undercover work: (1) tickets to Miami Heat games on four

occasions (May 28, 2012, June 17, 2012, December 1, 2012 and February 10, 2013);

(2) a room at the Fontainebleau Hilton Hotel in Miami Beach from February 16-18,

2013; (3) use of an Audi A8 from February 16-18, 2013 and (4) a $3,500 cash payment

made by Mr. Chulpayev on or about January 12, 2013 to the account for Agent

Jackson's undercover credit card.[29] <u>See</u> Government's Exhibit 58a.

The government also does not dispute that Mr. Chulpayev provided Agent

Jackson with the following items of value which <u>were related</u> to Agent Jackson's

---

[28] The parties dispute the relevant time frame of Agent Jackson's misconduct. The government argues that "[t]he trial of this case concluded on October 10, 2012, making relevant any misconduct by Jackson that was not disclosed prior to the end of trial." Government's Supplemental Memorandum (DE# 281 at 3, 7/25/15). Mr. Mack maintains that December 19, 2012 is the relevant cutoff date because that was the date the trial court stated it was denying Mr. Mack's renewed motion for severance. <u>See</u> Mack's Supplemental Memorandum (DE# 272 at 2 n.2, 6/30/15); Mack's Supplemental Reply (DE# 289 at 6 n.2, 9/6/16) (stating that "because the government has a continuing <u>Brady</u> obligation, Mr. Mack maintains all those gifts and benefits improperly accepted [by Agent Jackson] prior to the date of sentencing – when the district court ruled on the last pending motion for new trial – are relevant to the instant motion."). In any event, the undersigned finds that Agent Jackson was engaged in misconduct while the instant action was pending including through trial and the sentencing hearing of the defendants on December 19, 2012. There is no record evidence that Agent Jackson was engaged in misconduct during the investigation of the instant case which ended in January 2012.

[29]  On December 31, 2012, Agent Jackson made a $4,256.18 purchase at Bamboo Nightclub in Miami Beach using his undercover credit card. Mr. Chulpayev's $3,500 cash payment was made to offset that purchase.

undercover work:[30] (1) tickets to Miami Heat game on December 15, 2012; (2) use of a BMW from May 25-28, 2012 (Mr. Chulpayev also provided Detective Tyson with use of a BMW during this time, see Memorial Day weekend 2012 discussion above); (3) use of a Cadillac from July 13-15, 2012; (4) use of a Mercedes from August 2-5, 2012; (5) use of a vehicle from August 23-27, 2012; (6) use of a BMW X6 from September 13-15, 2012 (Agent Jackson was in Miami for trial preparation in the instant case);[31] (7) use of a BMW X6 and M35 Infiniti from September 18-21, 2012 (Agent Jackson was in Miami for trial preparation in the instant case); (8) use of a 6 Series BMW from September 30-October 5, 2012 (Agent Jackson was in Miami for trial preparation and for the trial in the instant case); (9) use of a vehicle from October 27-29, 2012; (10) use of a vehicle from November 10-13, 2012; (11) use of a vehicle from November 30-December 2, 2012; (12) use of a Lamborghini from December 12-17, 2012 (Mr. Chulpayev also provided Detective Tyson with use of a Mercedes during this time period) and (13) use of a vehicle from December 29-January 1, 2013. See Government's Exhibit 58b.

Additionally, on November 5, 2012, Mr. Chulpayev purchased a $2,000 wedding band on behalf of Agent Jackson. The band was purchased from a friend of Mr. Chulpayev who was a jeweler and was obtained at close to fair market value. In December 2012, Mr. Chulpayev purchased a designer watch on behalf of Agent

---

[30] The defendants maintain that the purpose for which Mr. Chulpayev gave Mr. Jackson gifts is immaterial "since the gifts were nonetheless improper." Mack's Supplemental Memorandum (DE# 272 at 6, 6/30/15). The undersigned agrees with the defendants that the purpose for which Mr. Chulpayev gave Mr. Jackson gifts does not lessen the fact that Agent Jackson's actions violated FBI policy.

[31] Although Agent Jackson had other open cases in South Florida at the time, Agent Howell found no evidence he was working on those cases when he came to Miami for trial preparation in the instant case.

Jackson. The watch was purchased from a jeweler who was a friend of Mr. Chulpayev at a "good customer discount." On several occasions in 2012 or 2013, Mr. Chulpayev purchased shoes on behalf of Agent Jackson at a discounted price. Agent Jackson reimbursed Mr. Chulpayev for the wedding band, the watch and the shoes. Beginning in the summer of 2012, Agent Jackson would eat meals at an Italian restaurant owned by a friend of Mr. Chulpayev and would only pay for the tip. Mr. Chulpayev would also lend Agent Jackson high-end watches to wear when Agent Jackson was in Miami.

At the end of 2012 or at the beginning of 2013, Agent Jackson's supervisors told him to stop having contact with Mr. Chulpayev. Agent Jackson continued to have contact with Mr. Chulpayev.

Although he has not yet been terminated, Agent Jackson has been relieved of his duties as an FBI agent. As of the date of completion of the parties' briefs, the DOJ-OIG's investigation into Agent Jackson's misconduct was ongoing and Agent Jackson had not yet been charged with any misconduct. Detective Tyson is not under investigation by the DOJ-OIG.

During the May 31, 2016 evidentiary hearing, Agent Howell testified that if Agent Jackson were to be charged with obstruction of justice in connection with the murder of Mr. Vernell, that misconduct by Agent Jackson would rank 10 out of 10. Case Agent Fowler testified that he would not have used Agent Jackson in this investigation if he had known that Agent Jackson had integrity issues. Transcript (DE# 257 at 128, 6/7/16).

## ANALYSIS

The defendants argue that they are entitled to a new trial under Brady v.

Maryland, 373 U.S. 83 (1963) and Rule 33 of the Federal Rules of Criminal Procedure.

The undersigned will address the requirements of Brady and then proceed to address

Rule 33.

**A.    Brady Violation**

Under Brady,

the defendant must show that (1) the government possessed favorable
evidence to the defendant; (2) the defendant does not possess the
evidence and could not obtain the evidence with any reasonable
diligence; (3) the prosecution suppressed the favorable evidence; and (4)
had the evidence been disclosed to the defendant, there is a reasonable
probability that the outcome would have been different.

United States v. Vallejo, 297 F.3d 1154, 1164 (11th Cir. 2002) (citing United States v.

Meros, 866 F.2d 1304, 1308 (11th Cir. 1989)). The government does not dispute that

the second element of Brady – that the defendants did not possess and could not have

obtained the evidence of Agent Jackson's misconduct through reasonable diligence – is

met here. See Government's Omnibus Response (DE# 191 at 12, 11/2/15).

Accordingly, the undersigned will only address the three remaining elements of Brady:

(1) the government possessed evidence favorable to the defendant; (2) the prosecution

suppressed the favorable evidence and (3) had the evidence been disclosed to the

defendant, there is a reasonable probability that the outcome would have been

different.

**1.    Whether the Government Possessed Favorable Evidence to the
        Defendants**

The first prong of Brady is whether the government "possessed" evidence

favorable to the defendants. This prong has two components: the withheld evidence

must be both favorable to the defendants and in the government's possession. The

40

defendants easily meet the favorable evidence requirement because "[e]vidence favorable to the accused includes impeachment evidence." <u>United States v. Newton</u>, 44 F.3d 913, 918 (11th Cir. 1994) (citing <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)). Here, evidence of Agent Jackson's misconduct could have been used to impeach Agent Jackson's credibility at trial.

The second component of the first prong – the government's possession of the evidence – is contested by the parties. In the instant case, it is undisputed that the two prosecutors and Case Agent Fowler were unaware of Agent Jackson's misconduct at the time of trial. Thus, the government's "possession" of the favorable evidence turns on whether Agent Jackson's knowledge of his own misconduct can be imputed on the prosecution.

The parties agree that the issue of whether Agent Jackson's knowledge can be imputed on the prosecution is governed by <u>Arnold v. McNeil</u>, 622 F. Supp. 2d 1294, 1297 (M.D. Fla. 2009), aff'd and adopted sub nom. <u>Arnold v. Sec'y, Dep't of Corr.</u>, 595 F.3d 1324 (11th Cir. 2010). However, the parties disagree on whether the facts of <u>Arnold</u> are analogous to the instant case. As such, a detailed discussion of <u>Arnold</u> is merited.

In <u>Arnold</u>, the defendant was convicted of the sale or delivery of cocaine based, in part, on the testimony of Detective Sinclair, the state's "principal investigator and witness." 622 F. Supp. 2d at 1297-98. At trial, the jury heard testimony that on May 27, 1998, Detective Sinclair and another officer, Detective Thomas, had been working undercover. <u>Id.</u> at 1316-17. On that day, Detective Thomas was posing as a drug user/buyer. <u>Id.</u> at 1316. Detective Thomas testified that shortly after he had completed

a drug transaction, a man later identified as the defendant passed by on a bicycle and briefly conversed with Detective Thomas. Id. Detective "Thomas asked the [man] to sell cocaine" to Detective Sinclair who was waiting nearby in an undercover vehicle "so that [Detective] Sinclair could also see [the seller]." Id. at 1317. Detective Thomas then observed "the seller ride his bicycle to the passenger side of the undercover vehicle, make eye contact with [Detective] Sinclair and then 'hastily' ride off on his bicycle in the other direction, calling out to [Detective] Thomas in response to his shouts that he [the seller] would return later." Id. Both Detective Thomas and Detective Sinclair testified at trial that the defendant had been the seller. Id. However, it was Detective Sinclair who had provided Detective Thomas with the defendant's name.[32] There was also evidence that on the day in question, Detective Thomas only saw part of the seller's face. Id. Thus, Detective Sinclair was "the only person to identify [the defendant] at the scene as the seller of the cocaine." Id. at 1310. At trial, Detective Sinclair testified that he "knew it was [the defendant] who had made the sale that day because he had known [the defendant] for at least twenty years." Id. at 1318. In closing argument, "the prosecutor suggested to the jury . . . that if the jury 'still had any doubt' based on [Detective]

---

[32] Detective Sinclair told Detective Thomas about the defendant:

[Detective] Sinclair explained to [Detective] Thomas that [Detective] Sinclair and the seller recognized each other and that the name of the individual who sold [Detective] Thomas the crack cocaine was Darryl Arnold. . . . Based on [Detective] Sinclair's supplying the name, on the following day [Detective] Thomas was able to locate a prior photograph of [the defendant]. . . . [Detective Thomas] testified that when he looked at the photograph, he made a positive identification, with no doubt in his mind at all.

Arnold, 622 F. Supp. 2d at 1317 (citations to the record omitted).

Thomas' identification [of the defendant], they need do no more than rely on the credible testimony of Detective Sinclair, who had known [the defendant] for twenty years." Id. The defendant was convicted of the drug charge.

Approximately three years after the defendant's conviction, Detective Sinclair pled guilty to "conspiracy to commit a civil rights violation leading to the murder of [a bank customer], conspiracy to distribute cocaine and conspiracy to obstruct justice." Arnold, 622 F. Supp. 2d at 1302. Detective Sinclair had engaged in these criminal acts at approximately the same time as the defendant's arrest and trial. Id. at 1310. In light of Detective Sinclair's criminal acts, the defendant sought habeas relief based on a Brady violation.

The court granted the defendant's habeas petition finding that all four prongs of Brady had been met. Arnold, 622 F. Supp. 2d at 1310-11, 1319. The court determined that: (1) the evidence of Detective Sinclair's criminality was favorable to the defendant and was in "possession" of the government; (2) the defendant could not have possessed the evidence or obtained it through reasonable diligence; (3) the government "suppressed" the evidence and (4) the evidence was material under Brady. Id.

In Arnold, as in the instant case, the prosecutor did not have actual, personal knowledge of Detective Sinclair's misconduct at the time of the defendant's trial. 622 F. Supp. 2d at 1312. Nonetheless, the court recognized that the prosecutor's lack of personal knowledge did not end the inquiry because "Brady applies to exculpatory and impeachment information that is in the possession of the 'prosecution team,' which includes investigators and the police." Id. at 1312 (citing Kyles v. Whitley, 514 U.S. 419,

43

437 (1995)). The court determined that the government both "possessed" and "suppressed" favorable evidence because Detective Sinclair was a member of the prosecution team: "Sinclair's knowledge of his own criminal conduct, constituting evidence that would be favorable to the defense, demonstrates that the prosecution both 'possessed' favorable evidence, in satisfaction of Brady's first prong, and 'suppressed' exculpatory or impeachment evidence, in satisfaction of Brady's third prong." Id. at 1316 (footnote omitted).

The court in Arnold noted that "[t]he facts of [the defendant]'s prosecution [we]re distinguishable from . . . other cases . . . in which no Brady violation occurred" because:

> **the nature of the information known to Sinclair about his own contemporaneous illegal involvement with local drug dealing** (i.e., threatening, shaking down, and otherwise co-opting local drug dealers) **was the same as the nature of the evidence the prosecutor needed and secured from Sinclair to convict [the defendant] at trial** for the sale and delivery of cocaine. Moreover, . . . it was Sinclair's ability to identify [the defendant] that was the key to the prosecution's case against [the defendant].

622 F. Supp. 2d at 1315 (emphasis added). The court noted that in closing argument, the prosecutor had used Detective Sinclair's testimony to bolster Detective Thomas' identification of the defendant as the person who purchased the narcotics. Id. (stating "if there's still any doubt . . . whether or not Detective Thomas was able to make a positive identification [of the defendant], which he told you he was positive, [if] you still have any doubt that he made a positive identification, you have Detective Sinclair's identification when he told you that there's no mistake, it was [the defendant], I've known him for 20 years."). The court in Arnold reasoned that:

> Given the necessity of [Detective] Sinclair's information to the prosecution of [the defendant] and the similarity of [Detective] Sinclair's criminal activities to the nature of the evidence used to convict [the defendant],

> [the defendant] ha[d] adequately demonstrated that [Detective] Sinclair
> was a member of the prosecution team and his information should be
> imputed to the prosecutor.

Id. at 1316 n.23.

The defendants argue that Agent Jackson was a member of the prosecution

team[33] in the same manner as Detective Sinclair was a member of the prosecution

team in Arnold.

The government maintains that the instant case is distinguishable from Arnold

because "[Agent] Jackson's testimony was corroborated in all material respects due to

the cumulative nature of the overwhelming evidence in this case and the allegations

against [Agent] Jackson in no way relate to the evidence that was relied on by the

prosecution at trial." Government's Omnibus Response (DE# 191 at 17, 11/2/15). For

these reasons, the government argues that Arnold is inapplicable and that the

prosecution team consisted only of the two AUSAs and Case Agent Fowler.

The undersigned finds that Agent Jackson's misconduct is sufficiently related to

the instant case to meet the first prong of Arnold. The instant case was a narcotics

investigation. Mr. Chulpayev often provided information to Agent Jackson about drug

dealers. He also provided money and the use of high-end vehicles to assist Agent

Jackson with these undercover narcotics investigations. Mr. Chulpayev even

---

[33] In his supplemental memorandum, Mr. Mack also argued that the government
conceded that Agent Jackson was a member of the prosecution team based on a
statement made by the AUSA at a status hearing on January 11, 2016. See Mack's
Supplemental Memorandum (DE# 272 at 9, 6/30/15) (citing Transcript 1-11-16 Status
Hearing (DE# 222 at 106, 2/26/16)). However, in its supplemental response, the
government did not concede the issue. See Government's Supplemental Memorandum
(DE# 281 at 2, 7/25/15). Accordingly, the undersigned will address the merits of
whether Agent Jackson was a member of the prosecution team.

participated in the Memorial Day weekend investigation by introducing Detective Tyson to the targets of the investigation, suspected drug traffickers Decensae White and Gary Bradford. Additionally, Mr. Vernell's murder was motivated by a belief that Mr. Vernell had stolen drugs from Mr. White and Mr. White was already the target of Agent Jackson's narcotics investigation at the time of Mr. Vernell's murder. Agent Jackson proceeded to protect Mr. Chulpayev from the murder investigation by lying to Detective Williams and withholding information from the Sandy Springs Police Department. Additionally, at least with respect to Mr. Mack, the jury heard Mr. Mack being referred to as a "dirty cop," while at the same time, Agent Jackson was himself engaging in misconduct.

Importantly, Agent Jackson's misconduct was contemporaneous with the instant prosecution. This is not a case where an agent's bad acts took place years before an investigation or trial. There was an overlap between Agent Jackson's misconduct and his testimony as a government witness in the trial in this matter. Here, the record evidence shows that after the government had concluded its investigation of the defendants, but before and during the trial of the defendants, Agent Jackson was engaged in protecting Mr. Chulpayev from the murder investigation while at the same time receiving things of value from Mr. Chulpayev. At the outset, Agent Jackson lied to Detective Williams of the Sandy Springs Police Department leading Detective Williams to believe that Mr. Chulpayev was a registered source for the FBI. Agent Jackson sought to protect Mr. Chulpayev by initially withholding Mr. Chulpayev's name from the Sandy Springs Police Department and not providing Mr. Chulpayev to the Sandy Spring Police Department for an interview. Instead, Agent Jackson interviewed Mr. Chulpayev

himself in July 2012 and did not disclose the occurrence of the interview (or information provided Mr. Chulpayev during the interview) to the Sandy Springs Police Department until October 2012, after the trial in this matter. Agent Jackson's involvement in the investigation of Mr. Vernell's murder was ultimately damaging to the prosecution of Mr. Chulpayev for crimes related to Mr. Vernell's murder and resulted in the suppression of two of Mr. Chulpayev's statements.

Additionally as in <u>Arnold</u>, Agent Jackson's undercover work in the instant case was clearly important to the investigation and to the evidence presented at trial. In his undercover capacity, Agent Jackson established a relationship with Mr. Bryant which led Mr. Bryant to solicit the assistance of Mr. McLendon and Mr. Mack in transporting sham cocaine from Club Dolce. Much of the audio-visual evidence used at trial was recorded at Agent Jackson's office in Club Dolce. Agent Jackson was an important government witness at trial and was the only witness who testified that the word "t-shirts" was commonly understood to be a code word for cocaine. For these reasons, the undersigned concludes that under <u>Arnold</u>, Agent Jackson was a member of the prosecution team. Agent Jackson's knowledge of his own misconduct should therefore be imputed on the government.

The defendants also cite <u>Moon v. Head</u>, noting that "[t]he Eleventh Circuit has expressly defined the term 'prosecution team' to 'includ[e] both investigative and prosecutorial personnel.'" Mack's Supplemental Reply (DE# 289 at 2, 9/6/16) (quoting <u>Moon v. Head</u>, 285 F.3d 1301, 1309 (11th Cir. 2002)). In <u>Moon</u>, the defendant failed to show that an investigator for the Tennessee Bureau of Investigation ("TBI") was a

member of the prosecution team in Georgia. The Eleventh Circuit explained that:

> (1) there was "no evidence that Tennessee law enforcement officials and Georgia prosecutors engaged in a joint investigation of the [murder of Thomas] DeJose . . . ." (2) "the Georgia and Tennessee agencies shared no resources or labor" and "they did not work together to investigate the DeJose or Callahan murders. Nor is there evidence that anyone at the TBI was acting as an agent of the Georgia prosecutor;" (3) [the TBI Investigator] was not under the direction or supervision of the Georgia officials, and, had he chosen to do so, could have refused to share any information with the Georgia prosecutor" and (4) "[a]t most, the Georgia prosecutor utilized [the TBI investigator] as a witness to provide background information to the Georgia courts."

Id. at 1310 (footnote omitted). The Eleventh Circuit concluded that these facts were "insufficient to establish [the TBI Investigator w]as part of the Georgia 'prosecution team.'" Id.

By contrast, in the instant case, Agent Jackson played an important role in the investigation of the defendants. As noted above, most of the recorded meetings took place in Agent Jackson's office at Club Dolce. Agent Jackson's office was also the pick up site for the sham cocaine on December 21, 2011 and January 14, 2012 and the location where Mr. Bryant and Mr. McLendon were paid for their work. Additionally, it is clear that while the investigation ended in January 2012 and two of the defendants (Mr. Bryant and Mr. Mack) were arrested in April 2012,[34] shortly thereafter in May 2012, Agent Jackson began engaging in misconduct which continued through the trial in the instant case.

Significantly, unlike the TBI investigator in Moon whose testimony served merely to provide the court with background information, Agent Jackson was an important

---

[34] Mr. McLendon was not arrested until June 21, 2012, after Agent Jackson was already engaging in misconduct.

government witness. The government used Agent Jackson to provide substantive testimony at trial. Thus, Agent Jackson falls within the definition of "prosecution team."

For these reasons, the undersigned concludes that Agent Jackson was part of the prosecution team and as such, Agent Jackson's knowledge of his own misconduct should be imputed on the government.

To meet the first prong of Brady, the defendants must show "that the Government possessed evidence favorable to the defendant (including impeachment evidence). The defendants have met this prong. The record is undisputed that the two prosecutors and Case Agent Fowler had no personal knowledge of Agent Jackson's misconduct at the time of trial. Nonetheless, Agent Jackson was a member of the prosecution team, and as such, Agent Jackson's knowledge of his own misconduct should be imputed on the government. Thus, the defendants have shown that the government was in "possession" of evidence of Agent Jackson's misconduct. Moreover, evidence of Agent Jackson's misconduct was favorable to the defendants for impeachment purposes because it would have undermined Agent Jackson's credibility as a witness.

**2.      Whether the Prosecution Suppressed Favorable Evidence**

Having determined that Agent Jackson was a member of the prosecution team, the undersigned further finds that the prosecution suppressed favorable evidence. It is undisputed that the defendants were not provided with evidence of Agent Jackson's misconduct at any time before trial. Accordingly, this prong is met.

**3.      Whether There Is a Reasonable Probability That the Outcome Would Have Been Different**

Lastly, the defendants must show that the withheld evidence was material. "The

49

prejudice or materiality requirement is satisfied if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Allen v. Sec'y, Florida Dep't of Corr., 611 F.3d 740, 746 (11th Cir. 2010) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). "Materiality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." Id. (citing Kyles v. Whitley, 514 U.S. 419, 436-37 & n.10 (1995)). "To prevail on his Brady claim, [a defendant] need not show that he more likely than not would have been acquitted had the new evidence been admitted," rather "[h]e must show only that the new evidence is sufficient to undermine confidence in the verdict." Wearry v. Cain, 136 S.Ct. 1002, 1006 (2016) (citation and internal quotation marks omitted).

Because there are differences in the evidence presented at trial against each defendant, the undersigned will address each defendant individually.

### a.    Mr. Bryant

Mr. Bryant argues that his "conviction is irreparably tainted because S/A Jackson was pivotal to both the sting operation which resulted in [Mr.] Bryant's criminal conduct, and the prosecution which resulted in his conviction." Bryant's Supplemental Memorandum (DE# 277 at 2, 7/2/16). According to Mr. Bryant, "Agent Jackson's integrity and credibility were . . . paramount to the government's case. The evidence of Agent Jackson's improper behavior, in his official capacity as an FBI agent, at the time of the trial, would have put the entire case in a different light." Bryant's Motion for New Trial (DE# 181 at 16, 10/8/15).

Importantly, it was not Agent Jackson who changed the focus of the undercover

50

investigation from extortion to narcotics. At the evidentiary hearing, Case Agent Fowler[35] testified that the decision to change the focus of the investigation was made by Case Agent Fowler and Miami agents. Additionally, Agent Jackson was not the only undercover agent in the instant case. Detective Tyson was present during the two meetings where Mr. Bryant and Mr. McLendon took possession of the sham cocaine. Both meetings, as well as numerous other meetings and conversations were recorded and played for the jury at trial. Thus, a significant amount of evidence that was presented at trial against Mr. Bryant was not dependent on Agent Jackson's credibility.

Mr. Bryant also raises the issue of entrapment and argues that:

> There exists a real, credible and even likely chance that Bryant was entrapped, given S/A Jackson's untrustworthiness and history of dishonesty, coupled with the fact that he orchestrated the sting that ensnared Bryant, by engaging in unmonitored conversations for which no one but S/A Jackson can account.

Bryant's Supplemental Memorandum (DE# 277 at 3-4, 7/2/16).

Mr. Bryant's entrapment defense is unsupported by the record evidence. "An entrapment defense has two elements: (1) the government induced the crime and (2) the defendant lacked predisposition to commit the crime before the inducement." United States v. Toussaint, 627 F. App'x 810, 814 (11th Cir. 2015). The "defendant bears the

---

[35] Mr. Bryant suggests that there were unmonitored conversations between Agent Jackson and Mr. Bryant because Case Agent Fowler testified that he relied on Agent Jackson's integrity and therefore did not closely monitor Agent Jackson the way he would monitor a civilian source. See Bryant's Supplemental Memorandum (DE# 277 at 2-3, 7/2/16). The only record evidence of an unrecorded conversation between Agent Jackson and Mr. Bryant took place on December 2, 2011 due to an equipment failure. Mr. Bryant has not presented any evidence refuting the substance of this conversation or shown a deliberate failure by Agent Jackson to record this conversation. Mr. Bryant's remaining claims of unreported/unrecorded conversations between Agent Jackson and Mr. Bryant are unsupported.

initial burden of production as to the element of governmental inducement." Id. A

defendant may meet this initial burden:

> by . . . producing evidence sufficient to create a jury issue "that the
> government's conduct created a substantial risk that the offense would be
> committed by a person other than one ready to commit it." United States
> v. Brown, 43 F.3d 618, 623 (11th Cir.1995) (quotation marks omitted). The
> defendant meets this burden if he **produces evidence that the
> government's conduct included some form of persuasion or mild
> coercion**. Id. **The defendant may show persuasion with evidence that
> he "had not favorably received the government plan, and the
> government had to 'push it' on him, or that several attempts at
> setting up an illicit deal had failed and on at least one occasion he
> had directly refused to participate."**

Id. at 814 (quoting United States v. Ryan, 289 F.3d 1339, 1344 (11th Cir. 2002)

(emphasis added)).

Here, there is no record evidence to support the element of inducement. At no

point in the recordings did Agent Jackson employ "persuasion or mild coercion."

Additionally, and as previously noted, the only evidence of an unrecorded conversation

between Mr. Bryant and Agent Jackson was the December 2, 2011 meeting. That

conversation was not recorded due to an equipment failure. Mr. Bryant has presented

no evidence as to the content of that conversation which would support an entrapment

defense. Importantly, the audio-visual recordings which were presented to the jury show

that Mr. Bryant knowingly and willingly participated in Agent Jackson's plan to transport

cocaine from Club Dolce on two separate occasions. At no point in the audio-visual

recordings did Mr. Bryant express reluctance to participating in this criminal activity.

Mr. Bryant's Brady claim fails because he cannot show that the withheld

evidence of Agent Jackson's misconduct was material. "[M]ateriality is not a sufficiency

of evidence test." Dennis v. Crews, No. 13-21064-CIV-ZLOCH, 2015 WL 7777274, at

*10 (S.D. Fla. Dec. 3, 2015) (citing Kyles, 514 U.S. at 434). "To satisfy Brady's materiality standard, [a defendant] must demonstrate that, had the favorable evidence been disclosed to the defense, there is a reasonable probability that the result of the proceeding would have been different." Arnold, 622 F. Supp. 2d at 1319. As to Mr. Bryant, there is no reasonable probability that the result of the trial would have been different. Even without Agent Jackson's testimony, the trial evidence against Mr. Bryant was overwhelming. Recorded conversations conclusively establish that Mr. Bryant agreed to transport what he believed was cocaine on December 21, 2011 and on January 14, 2012.

The audio-visual evidence presented to the jury reveals multiple instances where Agent Jackson spoke openly to Mr. Bryant about transporting cocaine. For example, during the December 9, 2011 meeting, Agent Jackson used the words "keys" and "kilos" in Mr. Bryant's presence to refer to the drugs that would be transported from Club Dolce. See Government's Exhibit 53 at Tab C, Transcript of 12/9/11 Meeting at 7-8, 20. During that same meeting, Agent Jackson told Mr. Bryant that "the amount of money on **cocaine** prices isn't what it used to be as far as you know." Id. at 21 (emphasis added). Mr. Bryant even hung up on Agent Jackson when Agent Jackson used the word "dope" in a conversation on December 10, 2011. See Government's Exhibit 53 at Tab D, Transcript of 12/10/11 Phone Call at 2. A few days later, Mr. Bryant explained to Agent Jackson that the reason Mr. Bryant had hung up was because Agent Jackson had used "the Coca Cola word." Government's Exhibit 53 at Tab E, Transcript of 12/15/11 Meeting at 4. Agent Jackson told Mr. Bryant during this conversation that he usually

used the code word "t-shirts."[36] Agent Jackson continued to use the word "t-shirts" in other recorded conversations with Mr. Bryant. Over a month later, Mr. Bryant was still concerned enough about the December 10, 2011 hang-up, that he relayed the incident to Detective Tyson on January 14, 2012.  See Government's Exhibit 53 at Tab J, Transcript of 1/14/12 Meeting at 9-10.

Importantly, Mr. Bryant was present when Agent Jackson placed "bricks" of sham cocaine into a duffel bag on December 21, 2011 and January 14, 2012. During the December 21, 2011 meeting, Detective Tyson expressly stated to Mr. Bryant and Mr. McLendon: "No deviation, no taste, neither one of y'all get high right?", Government's Exhibit 53 at Tab G, Transcript of 12/21/11 Meeting at 11, a statement that would be consistent with the "bricks" being cocaine. At trial Detective Tyson testified based on his experience in law enforcement that cocaine was packaged in the same manner as the sham cocaine was packaged in the instant case. See Trial Transcript (DE# 145 at 201-203, 1/14/13). He further explained that money would not be packaged in that manner because "[w]hen you're delivering money to anyone, people want to make sure that what they're getting there is money." Id. at 202. Detective Tyson also testified that based on his experience, you would not leave large sums of money in a parked car in a parking lot in the drug business. Id. at 203-204.

In light of the aforementioned trial evidence, the undersigned concludes that Mr. Bryant has failed to meet the materiality prong of Brady. Detective Tyson's testimony

---

[36] Even without Agent Jackson's trial testimony that "t-shirts" was a commonly understood code word for cocaine, the audio-visual evidence shows that Agent Jackson directly communicated to Mr. Bryant that Agent Jackson customarily used the word "t-shirt" to refer to cocaine. See Government's Exhibit 53 at Tab E, Transcript of 12/15/11 Meeting at 4.

and the audio-visual evidence presented at trial clearly show – independent of Agent Jackson's testimony – that Mr. Bryant believed he was transporting cocaine for Agent Jackson. As such, Mr. Bryant has not shown entitlement to a new trial under Brady.

      **b.**    **Mr. McLendon**

Mr. McLendon also argues that evidence of Agent Jackson's misconduct was material in the instant case. Mr. McLendon argues that "[a]ny attempt by the government to merely excise Jackson from the case would be fatal to the prosecution of McLendon." McLendon's Supplemental Memorandum (DE# 276 at 2, 7/1/16). Mr. McLendon notes that "[a]bsent Agent Jackson, there was no evidence of any mention of drugs in the presence of Mr. McLendon." McLendon's Reply (DE# 196 at 4, 11/16/15) (footnote omitted). Mr. McLendon further asserts that the audio/video recordings of Mr. McLendon "counting packages and [Detective Tyson] questioning [Mr.] McLendon insultingly about whether he gets high" are "fringe ambiguities" which "mean virtually nothing absent discussions that Agent Jackson larded into his conversations with codefendant Bryant." Id. at n.2. Accordingly to Mr. McLendon, "[a]bsent [Agent] Jackson['s testimony], the jury could not have rationally understood the full context of the dealings between [Agent] Jackson and [Mr.] Bryant and thus could not have known what second-hand knowledge could credibly have trickled down to [Mr.] McLendon." McLendon's Supplemental Memorandum (DE# 276 at 3, 7/1/16). However and as indicated above, the recorded statements between Agent Jackson and Mr. Bryant unmistakably show that Agent Jackson and Mr. Bryant spoke about transporting drugs. During the December 9, 2011 conversation, Agent Jackson used the words "kilos," "keys" and "cocaine." See Government's Exhibit 53 at Tab C,

Transcript of 12/9/11 Meeting at 7-8, 20, 21-22.  Additionally, when Agent Jackson used the word "dope," Mr. Bryant abruptly hung up the phone. See Government's Exhibit 53, Tab D at 2. Mr. Bryant later explained to Agent Jackson that the reason Mr. Bryant had hung up the phone was because Agent Jackson had used the "Coca Cola word." Government's Exhibit 53 at Tab E, Transcript of 12/15/11 Meeting at 4. Over a month later, Mr. Bryant relayed the incident to Detective Tyson. See Government's Exhibit 53 at Tab J, Transcript of 1/14/12 Meeting at 9-10. Moreover, Agent Jackson expressly told Mr. Bryant that Agent Jackson usually used the word "t-shirts" when referring to drugs. See Government's Exhibit 53 at Tab E, Transcript of 12/15/11 Meeting at 4. Thus, there is no merit to Mr. McLendon's argument that without Agent Jackson's trial testimony, the jury would not have understood that in the recorded conversations Agent Jackson and Mr. Bryant were discussing the transportation of drugs.

The government argues that Mr. McLendon is not entitled to a new trial "[b]ecause Detective Tyson was the key witness [that] secured the evidence and gave the testimony that incriminated McLendon." Government's Supplemental Memorandum (DE# 281 at 21-22, 7/25/15).

At trial, the government presented audio-visual recordings of Mr. McLendon on December 21, 2011 and January 14, 2012. On both occasions Agent Jackson filled the duffel bag with "bricks" of sham cocaine in Mr. McLendon and Mr. Bryant's presence. Mr. McLendon and Mr. Bryant even moved closer to get a better look at the contents of the duffel bag. As noted above, during the December 21, 2011 meeting, Detective Tyson expressly stated to Mr. Bryant and Mr. McLendon: "No deviation, no taste, neither one of y'all get high right?" Government's Exhibit 53 at Tab G, Transcript of

12/21/11 Meeting at 11. This statement that would be consistent with the "bricks" being

cocaine.[37] On both occasions Mr. Bryant and Mr. McLendon returned to Agent

Jackson's office at Club Dolce to obtain payment after making the deliveries. The jury

also heard testimony from Detective Tyson, based on his experience as a law

enforcement office, that: (1) cocaine is packaged in the same way as the sham cocaine

was packaged in the instant case; (2) money would not be packaged this way and (3)

large sums of money would not be left in a parked car in a mall parking lot in the drug

business. See Trial Transcript (DE# 145 at 201-204, 1/14/13).[38]

---

[37] Mr. McLendon argues that:

[Detective] Tyson's ambiguous hints about people who get high or about
tampering with the packages was . . . insufficient – particularly absent the
context provided by Jackson, not merely as to the McLendon interactions,
but also the recordings of the Jackson-Bryant conversations. That Tyson
told the defendants that there could be no deviation, test, or taste was
remarkably ambiguous. Deviation has nothing to do with drugs and
speaks merely to doing the job as specified. Testing (in the sense of
chemical testing) was not an intelligible request as there was not a drug
sale in this case, such that there was no basis for chemical or other actual
testing. Testing in any slang sense could have meant no more than
checking or examining the contents—to see what was inside. And the
ambiguous term "taste" was clearly used in a slang manner—people
generally do not taste cocaine as that is an extremely unproductive way of
experiencing its effects; it is a drug that is usually inhaled directly or by
smoking, and is only rarely injected, but not tasted, by users. So "taste,"
as a slang term, simply meant 'take some.' Moreover, getting a 'taste' of
illicit proceeds is at least as well known a use of the term as getting an
actual taste of cocaine.

McLendon's Supplemental Memorandum (DE# 276 at 9-10, 7/1/16) (footnote omitted).
At trial, Detective Tyson provided an explanation for why he asked Mr. Bryant and Mr.
McLendon if they "get high," see Trial Transcript (DE# 145 at 196, 1/14/13), and the jury
was entitled to credit that explanation.

[38] Mr. McLendon argues that:

[G]iven the government's admission that the back story for using Club

As set forth above, there was ample evidence through audio-visual recordings and Detective Tyson's testimony to support the jury's verdict against Mr. McLendon even without Agent Jackson's testimony. In light of the presentation of evidence (other than Agent Jackson's testimony) to the jury, Mr. McLendon has failed to show a reasonable probability that the outcome of the trial would have been different. Based on the foregoing, the undersigned concludes that Mr. McLendon has not shown entitlement to a new trial under Brady.

### c.   Mr. Mack

Mr. Mack argues that the government's failure to disclose Agent Jackson's misconduct entitles Mr. Mack to a new trial. Specifically, Mr. Mack argues that "[b]ecause 't-shirts' . . . was the only purported reference to drugs ever made in front of Mack, [Agent Jackson's] testimony was critical to the government's case, both in front of the jury, and on appeal." Mack's Reply (DE# 194 at 4, 11/16/15).

The government maintains that Mr. Mack is not entitled to a new trial and notes that "Detective Tyson conducted **_all_** of the incriminating discussions with Mack during

---

Dolce was that it was involved in a money laundering operation, DE145:257, and given that a lounge on South Beach is an odd place to store, or traffic in, large quantities of cocaine, but an excellent vehicle for laundering cash, the mixed message of referring to the packages as money meant the context and explanation offered by [Agent] Jackson was essential to the government.

McLendon's Supplemental Memorandum (DE# 276 at 5, 7/1/16). However, nothing precluded Mr. McLendon from making the argument at trial that he believed he was transporting money, not drugs. In fact, Mr. McLendon's counsel told the jury in closing argument that the government had failed to show Mr. McLendon knew he was transporting drugs and cited to the "this is money" statement by Detective Tyson. See Trial Transcript (DE# 147 at 111, 1/14/13). At trial, Detective Tyson provided an explanation for his statement "this is money," see Trial Transcript (DE# 145 at 194, 1/14/13), and the jury was entitled to believe Detective Tyson's explanation.

58

[the January 14, 2012] breakfast [meeting] that corroborated . . . Bryant['s] assurances that Mack knew cocaine was involved." Government's Supplemental Memorandum (DE# 281 at 17, 7/25/15) (emphasis in original). The government further notes that "Tyson testified that, based on all of his experience, nobody transporting cocaine on behalf of someone else would invite a cop to a meeting with the people he's transporting cocaine for unless it was a 'dirty cop.'" Id. (citing Trial Transcript (DE# 145 at 209, 1/14/13)). However, Mr. Mack would still be a "dirty cop" if he believed he was transporting money in order to assist in the laundering of drug proceeds. It was only Agent Jackson who testified that the word "t-shirts" is commonly understood to be a code word for cocaine. See Trial Transcript (DE# 145 at 93, 1/14/13).

The government focuses on Mr. Mack's knowledge of his participation in a criminal act:

> [Mr.] Mack, an armed 16-year police veteran in full uniform, had breakfast with two complete strangers who flat out told Mack they were criminals, reveling in the thought of police layoffs so they could come down to a wide-open Miami and get rich, all because of conversation Tyson initiated during Breakfast and explained at trial. Mack was not surprised, or even upset, when they admitted they were criminals because Mack was aware they were drug dealers long before the breakfast meeting. Mack knew beforehand that Bryant was going to use the fake name "James" to introduce him which is why he was not surprised and did not correct Bryant and is also why he [was not wearing] his name tag. Mack fully understood cocaine was involved because he calmly agreed with Tyson's street-talk admonishment that Tyson would be "f*cked" if Mack got "shaky" and subsequently changed his mind and that Tyson would be concerned about being "robbed" by Mack, so the drug deal would be cancelled and "ain't nobody making money."

Government's Supplemental Memorandum (DE# 281 at 17-18, 7/25/15). The record evidence is clear that Mr. Mack knew he was engaged in illegal activity. See supra. He did not object to the use of a pseudonym and showed up to the January 14, 2012

breakfast meeting in full uniform, but no name tag, among other things. The issue here

is whether Mr. Mack knew he was conspiring to possess with intent to distribute cocaine

(Count 1); attempting to possess with intent to distribute cocaine (Count 3) and

possessing a firearm in furtherance of drug trafficking (Count 4) -- the crimes which the

jury found Mr. Mack guilty.

 The government further argues that Mr. Mack would not have wanted to impeach

Agent Jackson regarding the meaning of the word "t-shirts:"

> <u>Most notably, Mack neglects to mention that Jackson repeatedly testified
> at trial that he had no idea whether Mack knew, or even had a "clue," that
> t-shirts was a code word for cocaine</u> (GX53:O:115, 126). This portion of
> Jackson's testimony is critical because it completely undercuts Mack's
> argument that newly discovered evidence would have successfully
> impeached Jackson's "t-shirt" testimony. Mack would not even want to
> impeach Jackson's testimony that he did not have a "clue" whether Mack
> knew "t-shirts" was a code word for cocaine because Jackson's testimony
> in this regard was very favorable to Mack. Attempting to impeach
> Jackson's personal knowledge that "t-shirts" was a common code word for
> cocaine would have been equally ineffective because Jackson told Bryant
> he "usually" uses this code word during their recorded meeting on
> December 15th (GX53:E:4). <u>And, to be perfectly clear, Jackson
> specifically testified that he was not imputing Bryant's knowledge of
> Jackson's code word to Mack</u> (GX53:O:115).

Government's Supplemental Memorandum (DE# 281 at 19, 7/25/15) (emphasis in

original). Mr. Mack responds that "[Agent] Jackson still provided the only evidence from

which the jury could find – and from which the government argued – that [Mr.] Mack

must have known that "T-shirts" meant drugs" and "the Eleventh Circuit cited this

testimony in sustaining . . . [Mr. Mack's] conviction," thereby proving that this testimony

was material. <u>See</u> Mack's Supplemental Reply (DE# 289 at 12, 9/6/16) (citing <u>Mack</u>,

572 F. App'x at 920).

 Mr. Mack further notes that "Agent Jackson was also the only witness who

testified that [Mr.] Mack conducted 'counter-surveillance' when he pointed out a car in the restaurant parking lot – an allegation as subjective as it was incriminating." Mack's Reply (DE# 194 at 4-5, 11/16/15). The government minimizes the importance of this evidence, noting that Agent Jackson was only asked two questions on this subject and "[t]he government's closing argument made a very brief reference to this testimony." Government's Supplemental Memorandum (DE# 281 at 19-20, 7/25/15). The government maintains that "[g]iven the conversation that occurred in the restaurant and upon leaving the restaurant, the brief and insignificant nature of this evidence makes it cumulative, if even that, and in no way supports Mack's request for a new trial." Id. at 20.

The undersigned agrees with the government that the "counter-surveillance" evidence is insignificant and does not provide a basis for a new trial. Nonetheless, based on Agent Jackson's other testimony, the undersigned concludes that there is a reasonable probability that had evidence of Agent Jackson's misconduct been disclosed, the outcome of the trial would have been different with respect to Mr. Mack. Arnold, 117 F.3d at 1317-18. The only reference to "t-shirts" made in Mr. Mack's presence occurred during a conversation between Mr. Mack and Agent Jackson. See Government's Exhibit 53 at Tab L, Transcript of 1/14/12 Meeting at 61 (stating "So, you know, we got this many, this many t-shirts coming through"). After a clip of this conversation was played to the jury, Agent Jackson told the jury that he used the word "t-shirts" in that conversation to refer to cocaine.[39] Detective Tyson was not present

---

[39] At trial, Agent Jackson testified as follows:

Q. And you also say, "This many, this many T-shirts coming through."

during this conversation.

The government correctly notes that the jury could have considered Mr. Bryant's numerous recorded statements to Agent Jackson and Detective Tyson as evidence that Mr. Mack knew Mr. Bryant and Mr. McLendon were transporting cocaine for Agent Jackson on January 14, 2012. See, e.g., Government's Exhibit 53 at Tab I, Transcript of 1/14/12 Meeting at 5, 7-8; Government's Exhibit 53 at Tab J, Transcript of 1/14/12 Meeting at 16-17. However, to satisfy the materiality prong of Brady, Mr. Mack is not required to show that had the evidence of Agent Jackson's misconduct been disclosed, Mr. Mack would have been acquitted. "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence;' thus, [a defendant] may demonstrate a Brady violation by 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Arnold, at 1316 (quoting Kyles, 514 U.S. at 434). Given that Agent Jackson was the only witness who testified that the word "t-shirts" was commonly understood as a code word for cocaine,

_____

What are you talking about there?

A. The cocaine. I was very specific with the term I used just because of the previous event that happened with Henry Bryant, and I worked drugs in Atlanta. That's what I do. I'm an agent on the drug squad. And T-shirts is a very common drug term used in Atlanta for drugs. So that's the terminology I knew to use. So I referred to the cocaine as T-shirts to avoid using cocaine or coke or one of those words that would cause an event.

Trial Transcript (DE# 145 at 92-93, 1/14/13). During cross-examination, Agent Jackson clarified that the word "t-shirts" was used "[n]ot just Atlanta . . . but everywhere." Id. at 115.

the undersigned is persuaded that confidence in Mr. Mack's guilty verdict had been undermined.

In sum, the undersigned concludes that Mr. Mack has met all of the <u>Brady</u> prongs and is entitled to a new trial.[40] Mr. Bryant and Mr. McLendon have failed to show a reasonable probability that the outcome would have been different and are therefore not entitled to a new trial under <u>Brady</u>.

### d.    Miscellaneous Arguments

The defendants raise numerous additional arguments which are not persuasive. The undersigned rejects the argument that Agent Jackson's misconduct undermines the quality of the investigation as a whole. <u>See</u>, <u>e.g.</u>, Mack's Supplemental Memorandum (DE# 272 at 13-14, 6/30/15). Case Agent Fowler testified that the decision to change the focus of the investigation from extortion to narcotics was made

---

[40] In his supplemental memorandum, Mr. Mack argues that in addition to <u>Brady</u>, the government also violated <u>Giglio</u> and <u>Bagley</u>. <u>See</u> Mack's Supplemental Memorandum (DE# 272 at 15, 6/30/15) (stating that "the government's failure to disclose the evidence violated <u>Brady</u>, <u>Giglio</u>, and <u>Bagley</u>, as well as the Due Process Clause of the Fifth Amendment, and should result in a new trial."). In this Report and Recommendation the undersigned finds that Mr. Mack is entitled to a new trial under <u>Brady</u>. Therefore it is unnecessary to address Mr. Mack's arguments concerning other violations. To the extent Mr. Bryant and Mr. McLendon are seeking to rely on <u>Giglio</u>, <u>Bagley</u> and the Due Process Clause, the undersigned finds that Mr. Bryant and Mr. McLendon are not entitled to relief. There is no <u>Giglio</u> violation here: while Agent Jackson's credibility is at issue, there is no record evidence that Agent Jackson presented perjured testimony at trial. <u>See</u> <u>Hammond v. Hall</u>, 586 F.3d 1289, 1306-07 (11th Cir. 2009) (stating that "[a] <u>Giglio</u> claim involves an aggravated type of <u>Brady</u> violation in which the suppression of evidence enabled the prosecutor to put before the jury what he knew was false or misleading testimony . . . or allowed the prosecutor himself to make a false statement to the jury.") (citations omitted). Mr. Bryant and Mr. McLendon are not entitled to relief under <u>Bagley</u> because they cannot show materiality for the reasons discussed in this Report and Recommendation. <u>See</u> <u>Kyles</u>, 514 U.S. at 434-438 (discussing materiality under <u>Bagley</u>). Finally, the undersigned concludes Mr. Bryant and Mr. McLendon have not shown a due process violation because they cannot show materiality.

by the case agent and other Miami agents and was not made by Agent Jackson. Additionally, the only evidence of a recording malfunction occurred on December 2, 2011 during a meeting between Agent Jackson and Mr. Bryant. As discussed in this Report and Recommendation, Mr. Bryant's own recorded statements show that Mr. Bryant was well aware that the December 21, 2011 and January 14, 2012 deliveries were of cocaine. Additionally, Mr. Mack and Mr. McLendon were not present at the December 2, 2011 meeting. Thus, there is no record evidence to support the argument that the December 2, 2011 audio/visual equipment failure would have been material as to any of the defendants.

The defendants note that "Agent Jackson also vouched for the existence of the sham cocaine, which had gone missing prior to trial." Mack's Supplemental Memorandum (DE# 272 at 14, 6/30/15); see also McLendon's Supplemental Memorandum (DE# 276 at 14, 7/1/16) (referring to "the important fact of the unexplained loss of crucial evidence: the supposed sham cocaine packages from the initial transportation and at least one recorded conversation between Jackson and Bryant.").[41] However, as the government points out, another agent, Agent Wanda Mitial, "testified she had collected this evidence and [gave] it to the case agent on the day the operation was concluded." Government's Omnibus Response (DE# 191 at 15, 11/2/15) (citing Trial Transcript (DE# 146 at 114-121, 1/14/13). The jury was shown audio-visual evidence of Agent Jackson placing the sham cocaine into a duffel bag on December 21, 2011 and on January 14, 2012. See Government's Exhibit 9 at Clip 2 (Video Clip);

---

[41] Mr. McLendon also raises "[t]he unexplained failure to pursue charges against another officer, Taurus Barron," McLendon's Supplemental Memorandum (DE# 276 at 14, 7/1/16), but fails to link that decision to Agent Jackson.

Government Exhibit 13, Clip 1 (Video Clip). Additionally, the government introduced into evidence photographs of the sham cocaine. See Government's Exhibits 18a-d and 20a-d. Thus, Agent Jackson's testimony vouching for the existence of the sham cocaine was not material.

The undersigned also rejects the argument that "evidence of Jackson's improper relationship with Chulpayev would have also raised questions about the character of KayTee Tyson." Mack's Supplemental Memorandum (DE# 272 at 14, 6/30/15); Mack's Supplemental Reply (DE# 289 at 2 n.1, 9/6/16) (asserting that "Tyson's close friendship with Jackson as well as his repeated partnership with both Jackson and Chulpayev would have provided grounds for defense counsel to question Tyson's integrity right along with that of Jackson."); McLendon's Supplemental Memorandum (DE# 276 at 14, 7/1/16) (arguing that "Tyson's exaggerations of the evidence . . . in his testimony at the evidentiary hearing and his suggestions of defense of Jackson, show that it was consistent with his friendship with Jackson to cover for Jackson's failure to clearly eliminate the notion of a money laundering operation as the subject of the two trips to Aventura."). There is no record evidence of any wrongdoing by Detective Tyson. Detective Tyson did not know and had no reason to know that Mr. Chulpayev was the source of the money and cars provided to Detective Tyson by Agent Jackson. With respect to Detective Tyson's alleged "exaggerations" at the evidentiary hearing, the defendants have failed to show that Detective Tyson exaggerated his testimony at trial or had reason to testify at trial in a manner that favored Agent Jackson, particularly since there is no record evidence that Detective Tyson knew of Agent Jackson's misconduct at the time of trial. Detective Tyson's friendship with Agent Jackson does

not affect the undersigned's determination that the jury was permitted to rely on Detective Tyson's testimony at trial.

In sum, <u>Brady</u> prohibits "the suppression by the prosecution of evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment. . . ." <u>Brady</u>,  373 U.S. at 87. Mr. Mack has met all four prongs of <u>Brady</u> and is entitled to a new trial. Because Mr. Bryant and Mr. McLendon have failed to show that evidence of Agent Jackson's misconduct was material in their case, they have not shown a <u>Brady</u> violation.

**B.      Rule 33**

Alternatively, the defendants argue that they are entitled to a new trial under Rule 33.  To obtain a new trial based on newly discovered evidence under Rule 33, the defendants must show:

> (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result.

<u>United States v. Brinson</u>, 628 F. App'x 1018, 1020-21 (11th Cir. 2015). "The failure to satisfy any one of these elements is fatal to a motion for a new trial." <u>Id.</u> (citation and internal quotation marks omitted).

In the instant case, the government concedes two elements: (1) that the evidence was newly discovered and had been unknown to the defendants at the time of trial and (2) that the failure to learn of the evidence was not due to a lack of due diligence on the part of the defendants. <u>See</u> Government's Omnibus Response (DE# 191 at 22, 11/2/15). With respect to the remaining factors, the government relies on the

arguments raised in response to the asserted <u>Brady</u> violation. <u>Id.</u>

For the reasons stated below, the undersigned finds that all of the defendants have failed to show that evidence of Agent Jackson's misconduct was more than merely impeachment evidence. Additionally, Mr. Bryant and Mr. McLendon have failed to show that the withheld evidence was material to the issues before the Court and that it was such that a new trial would probably produce a different result.

Because the defendants must satisfy all five elements of Rule 33 to obtain a new trial, the Court should DENY the defendants' motions on this ground.

### 1.     Whether Evidence was Not Merely Cumulative or Impeaching

The undersigned finds that evidence of Agent Jackson's misconduct constitutes impeachment evidence. Therefore, the defendants have failed to meet this element of Rule 33.

The defendants argue that the evidence of Agent Jackson's misconduct was more than mere impeachment evidence because the government would not have called Agent Jackson to testify at trial had the evidence of the misconduct been made public at that time. <u>See</u> Mack's Supplemental Memorandum (DE# 272 at 16-17, 6/30/16). The defendants note that: (1) Case Agent Fowler testified that he would not have used Agent Jackson if issues concerning Agent Jackson's integrity had been known at that time; (2) Special Agent Howell testified that Agent Jackson has not been used as a witness in any FBI case since allegations of his misconduct became public and (3) it has been established that Agent Jackson would have asserted his Fifth Amendment rights if called to testify had the evidence of his misconduct been disclosed to the defendants at the time of trial. <u>Id.</u> at 16-17.

The government maintains that "arguments that Jackson would have asserted his rights under the Fifth Amendment had the criminal investigation commenced prior to trial serve no purpose" because "[t]he criminal investigation had not started and no evidence exists that one would have started given the facts that existed in October of 2012." Government's Supplemental Memorandum (DE# 281 at 26, 7/25/15).

The defendants rely on United States v. Jones, 84 F. Supp. 2d 124, 126-27 (D.D.C. 1999) for the proposition that evidence is more than mere impeachment where it would have prevented a witness from testifying at trial. See Mack's Supplemental Memorandum (DE# 272 at 16-17, 6/30/16). The government argues that Jones is distinguishable from the instant case because the evidence in Jones was not merely impeaching, but also false. See Government's Supplemental Memorandum (DE# 281 at 26, 7/25/15). The government notes that there is no evidence that Agent Jackson's testimony was false. Id.

In Jones, the defendant was convicted on a single count of possession with intent to distribute heroin. Jones, 84 F. Supp. 2d at 124. During the trial, the government called Detective Brown, a narcotics expert, to provide expert testimony. Id. The defendant's counsel stipulated to Detective Brown's qualifications as an expert and "Detective Brown did not testify at [the defendant's] trial about his qualifications." Id. In a subsequent, unrelated proceeding, Detective Brown's credentials were called into question and it was discovered that Detective Brown had "in the past . . . held himself out as having a degree in pharmacology" when he held no such degree. Id. at 124. In light of this newly discovered evidence, the defendant moved for a new trial under Rule 33. Id. The court granted the defendant's motion. It found that not only would this newly

68

discovered evidence have impeached Detective Brown's credibility, it "would have kept [Detective] Brown from taking the stand at all." Id. at 126. The court further found that Detective Brown's testimony "filled in all of the gaps of the government's case and was clearly material to the jury's determination." Id. Notably, the defendant was not caught with drugs on his person. Rather, the defendant had "offered something called 'Party with the stars'" to a plainclothes police officer. Id. at 125. The court noted that the defendant's "offering of 'Party with the stars' to [the plainclothes police officer was] damning because [Detective] Brown identified 'Party with the stars' as a brand of heroin." Id. at 126. Additionally, the defendant was found with $25.00 in his possession and Detective Brown provided "testimony that a small bag of heroin costs between $20 and $25" and Detective "Brown's testimony alone allowed the jury to imply that [the defendant] received $25 for the sale of a small bag of heroin." Id. The court also noted that "[h]ad that evidence been available at the time of [the defendant's] trial, it is inconceivable that [Detective] Brown would have been offered as a witness by the government." Id. at 126-27.

The undersigned does not agree with the reasoning in Jones and Jones is not binding on this Court. In addition, Jones is distinguishable from the instant case because it involved the testimony of an expert. Evidence of Detective Brown's lack of a pharmacology degree and his prior false statements about that degree would have raised questions about Detective Brown's qualifications as a narcotics expert. Moreover, unlike in Jones, evidence of Agent Jackson's misconduct is not "such that a new trial would probably produce a different result" with respect to Mr. Bryant and Mr. McLendon. This is because the other evidence presented at trial – audio-visual

recordings and Detective Tyson's testimony – support Mr. Bryant and Mr. McLendon's convictions for the reasons already stated in this Report and Recommendation. There is nothing in the <u>Jones</u> decision that relieves Mr. Bryant and Mr. McLendon from the burden of establishing the probability of a different result. In <u>Jones</u>, the trial court noted that not all convictions obtained in cases where Detective Brown's testified as an expert would be overturned. <u>Id.</u> at 127 ("The Court is mindful of the problem now facing the government in the many cases where Detective Brown gave expert witness testimony on the drug trade in this city. . . . This Court is permitted only to consider this case, on the facts before it.") (footnote omitted). The court noted that at least one judge had denied a new trial in a case where Detective Brown had testified because "the remaining evidence was overwhelming against the defendant." <u>Id.</u> at 127 n.1. The same is also true for Mr. Bryant and Mr. McLendon.

The defendants further argue that evidence of Agent Jackson's misconduct is more than mere impeachment evidence because the government itself has questioned Agent Jackson's integrity and is currently pursuing a criminal investigation into Agent Jackson's misconduct. <u>See</u> Mack's Supplemental Memorandum (DE# 272 at 18, 6/30/15). Mr. Mack cites <u>Espinosa-Hernandez</u>, 918 F.3d 911 (11th Cir. 1990) and <u>Mesarosh v. United States</u>, 352 U.S. 1 (1956) "for the proposition that when the government itself has cause to question the credibility of a government agent (or the equivalent thereof, in the <u>Mesarosh</u> case) newly discovered evidence may be more than merely impeaching." <u>Id.</u> at 19 (internal quotation marks omitted). The undersigned is unpersuaded by this argument and in any event Mr. Bryant and Mr. McLendon have failed to overcome the other elements of a Rule 33 motion for new trial.

The defendants also argue that it would have been unlikely that the government would have been able to authenticate the audio-visual evidence without Agent Jackson's testimony. See Mack's Supplemental Memorandum (DE# 272 at 16-17, 6/30/16); Bryant's Supplemental Memorandum (DE# 277 at 5, 7/2/16) (stating that "[t]here are several recordings of conversations between S/A Jackson and Bryant that the Government would . . . be unable to authenticate if S/A Jackson was unavailable to testify.").

The defendants' authentication argument lacks merit. The December 21, 2011 and January 14, 2012 meetings where Mr. Bryant and Mr. McLendon took possession of the sham cocaine and the January 14, 2012 breakfast meeting could have been authenticated at trial by Detective Tyson because he was present at those events. Although Detective Tyson was not present for the numerous recorded conversations between Agent Jackson and Mr. Bryant which took place in December 2011, the government could have still authenticated this evidence through Detective Tyson. In United States v. Ligambi, 891 F. Supp. 2d 709 (E.D. Pa. 2012), an informant had passed away and was therefore unavailable as a witness. The government was nonetheless permitted to authenticate the voices on the tape recordings made by the informant through "both direct and circumstantial evidence . . . including voice identification, surveillance team identification, and self-identification by various participants." Id. at 718. Similarly here, the government could have used Detective Tyson to authenticate the voices on the December 2011, recordings of Mr. Bryant and Agent Jackson. Detective Tyson was clearly familiar with both Mr. Bryant and Agent Jackson's voices. Detective Tyson personally met and spoke with Mr. Bryant on

71

December 21, 2011 and January 14, 2012. Additionally, Detective Tyson was a long

time friend of Agent Jackson and was therefore competent to identify Agent Jackson's

voice. Most of the December 2011 conversations between Agent Jackson and Mr.

Bryant were visually recorded (in addition to audio). Thus, Detective Tyson could have

also identified both men by sight. The defendants' argument that the government would

not have been able to authenticate the audio-visual and recorded evidence without

Agent Jackson lacks merit.[42]

Finally, the defendants argue that the withheld evidence is more than mere

impeachment evidence because of the seriousness of Agent Jackson's misconduct:

> The evidence in this case meets this standard. It cannot be forgotten that
> this was a **public corruption case**, where the government repeatedly
> accused Mack of being a "dirty cop." The fact that Agent Jackson, who
> was the central figure in the undercover investigation, has since been

---

[42] Additionally, the presentation of the audio-visual recordings of Agent Jackson
would not have violated the Confrontation Clause if Agent Jackson had not testified at
trial. In United States v. Price, 792 F.2d 994, 996 (11th Cir. 1986), the defendant
delivered hashish oil to a confidential informant. "[The informant] made consensual tape
recordings of telephone conversations and meetings with [the defendant]." The
informant died a few months later. Id. The government presented the recorded
conversations as evidence at trial and secured the defendant's conviction. Id. On
appeal, the Eleventh Circuit rejected the defendant's argument that his "Sixth
Amendment right of confrontation and to present a defense was violated when the court
allowed the introduction of these taped conversation between [the informant] and [the
defendant] into evidence." Id. The Eleventh Circuit reasoned that:

> Because [the informant]'s statements were not hearsay, but rather were
> offered to put into context those statements of [the defendant], [the
> informant was] not subject to impeachment under the first part of that rule.
> Nor were [the informant]'s statements admitted against [the defendant]
> and were not statements by an agent, a person authorized, or a
> co-conspirator under FRE 801(d)(2), (C), (D), or (E). Therefore, FRE 806
> does not apply to allow impeachment of [the informant].

Id. at 996-97. Here, Agent Jackson's statements in the audio-visual recordings would
have also been introduced to provide context.

> proven to be a '10 out of 10' on the corruption scale, would have turned the government's case on its head, and goes well beyond "merely" impeaching the testimony of a single witness.

Mack's Supplemental Memorandum (DE# 272 at 20, 6/30/16) (emphasis in original).

The undersigned disagrees with the characterization of the instant case as a public corruption case. None of the defendants were charged with public corruption in this case. Moreover, it is clear that the public corruption component of the investigation had ended by the time Mr. Mack and Mr. McLendon became targets of the investigation. By that time, the case had become a narcotics investigation. In any event, Mr. Bryant and Mr. McLendon cannot show that the evidence of Agent Jackson's misconduct was such that a new trial would probably produce a different result.

### 2.      Whether the Evidence is Material to the Issues Before the Court

The defendants argue that Agent Jackson's testimony was highly material at trial. According to the defendants, Agent Jackson's trial testimony "filled in the gaps in the government's case" because Agent Jackson "was permitted to testify as to what he understood the highly ambiguous audio visual evidence in the case to mean." Mack's Supplemental Memorandum (DE# 272 at 17, 6/30/15). The government characterizes Agent Jackson's "comments about portions of the videos [as] self-explanatory." Government's Supplemental Memorandum (DE# 281 at 26, 7/25/15). The undersigned rejects the argument that Agent Jackson's testimony was material to securing the convictions of Mr. Bryant and Mr. McLendon for the reasons already stated in this Report and Recommendation. Additionally, it is not necessary to reach the Rule 33 argument with respect to Mr. Mack because he is entitled to a new trial under Brady.

      3.     **Whether the Evidence Is Such That a New Trial Would Probably Produce a Different Result**

The last element under Rule 33 is "substantially similar" to the materiality inquiry under Brady. United States v. Phillips, 177 F. App'x 942, 959 (11th Cir. 2006) (noting that "the materiality inquiry under the Brady test is substantially similar to the final step of the Rule 33 test."). For the reasons already stated in the Brady analysis, Mr. Bryant and Mr. McLendon have not shown that a new trial would probably produce a different result. The undersigned has already determined that Mr. Mack is the only defendant who has met the materiality requirement of Brady. For the reasons already stated, Mr. Mack is also the only defendant who meets the final element of Rule 33.

In sum, none of the defendants have shown entitlement to a new trial under Rule 33 because they have failed to show that evidence of Agent Jackson's misconduct was more than mere impeachment evidence. Additionally, Mr. Bryant and Mr. McLendon have failed to show that a new trial would probably produce a different result.

**C.    Mr. Bryant and Mr. McLendon's Convictions for Aiding and Abetting**

The defendants also argue that "[i]f Mack's conviction was improperly obtained, [Mr. Bryant and] McLendon's § 924(c) conviction was likewise improperly obtained." McLendon's Supplemental Memorandum (DE# 276 at 16, 7/1/16) (citing United States v. Martin, 747 F.2d 1404, 1408 (11th Cir. 1984)). The government did not address this argument.

Mr. Bryant and Mr. McLendon have not shown that they would be entitled to a new trial on the firearm charge (Count 4), if Mr. Mack is granted a new trial. Mr. Bryant and Mr. McLendon have failed to show that confidence in their guilty verdicts for the

firearm charge (Count 4) would be undermined. If this Report and Recommendation is adopted, Mr. Mack would not be acquitted, he would merely be receiving a new trial. Moreover, confidence in Mr. Bryant and Mr. McLendon's convictions does not hinge on Mr. Mack's conviction. See United States v. Raffone, 693 F.2d 1343, 1348 (11th Cir. 1982) (noting that "[i]n Standefer v. United States, 447 U.S. 10, 100 S.Ct. 1999, 64 L. Ed. 2d 689 (1980), the Supreme Court ruled that the acquittal of a charged principal does not foreclose the subsequent conviction of an aider and abettor."). Accordingly, the Court should deny Mr. Bryant and Mr. McLendon's motion for new trial on this ground.

## RECOMMENDATION

In accordance with the foregoing, the undersigned respectfully RECOMMENDS that the Defendant Henry Lee Bryant's Rule 33 Motion for New Trial Based on Newly Discovered Evidence with Incorporated Memorandum of Law, and Motions for Full Discovery, for an Evidentiary Hearing, and to Adopt the Corresponding Motions Filed or to be Filed by and on behalf of Codefendants Mack & McLendon (DE# 181, 10/8/15) and Defendant McLendon's Motion for New Trial and an Evidentiary Hearing and Supporting Memorandum of Law (DE# 187, 10/13/15) be **DENIED** and that Defendant Daniel Mack's Motion for New Trial Pursuant to Fed. R. Crim. P. Rule 33 and Brady v. Maryland, 373 U.S. 83 (1963), and Request for Hearing (DE# 182, 10/8/15) be **GRANTED**.

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to file

objections timely shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

　　　　RESPECTFULLY SUBMITTED in Chambers, at Miami, Florida, this **27th** day of October, 2016.

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　JOHN J. O'SULLIVAN
　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

Copies to:
United States District Judge Moreno
All counsel of record